# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

MICHAEL RAFAEL CANIZALES et al.,
Defendants and Appellants.

S221958

Fourth Appellate District, Division Two
E054056

San Bernardino County Superior Court
FVA1001265

June 24, 2019

Chief Justice Cantil-Sakauye authored the opinion of the court, in which Justices Chin, Corrigan, Liu, Cuéllar, Kruger and Groban concurred.

PEOPLE v. CANIZALES

S221958


Opinion of the Court by Cantil-Sakauye, C. J.


This case concerns whether the trial court properly instructed the jury on the so-called kill zone theory, under which a defendant may be convicted of the attempted murder of an individual who was not the defendant's primary target. As we shall explain, we conclude that a jury may convict a defendant under the kill zone theory only when the jury finds that: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm — that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death — around the primary target; and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm.

We caution, however, that trial courts must be extremely careful in determining when to permit the jury to rely upon the kill zone theory. The kill zone theory permits a jury to infer a defendant's intent to kill an alleged attempted murder victim from circumstantial evidence (the circumstances of the defendant's attack on a primary target). But, under the reasonable doubt standard, a jury may not find a defendant acted with the specific intent to kill everyone in the kill zone if

the circumstances of the attack would also support a reasonable alternative inference more favorable to the defendant. (See CALCRIM No. 225.) Permitting reliance on the kill zone theory in such cases risks the jury convicting a defendant based on the kill zone theory where it would not be proper to do so. As past cases reveal, there is a substantial potential that the kill zone theory may be improperly applied, for instance, where a defendant acts with the intent to kill a primary target but with only conscious disregard of the risk that others may be seriously injured or killed. Accordingly, in future cases trial courts should reserve the kill zone theory for instances in which there is sufficient evidence from which the jury could find that the *only* reasonable inference is that the defendant intended to kill (not merely to endanger or harm) everyone in the zone of fatal harm.

In the present matter, defendants Michael Canizales and KeAndre Windfield were jointly charged and tried before a single jury on counts including first degree murder and two attempted murders. The trial court gave a kill zone instruction in connection with one of the two alleged attempted murder victims. The Court of Appeal concluded that the jury was properly instructed on that theory, and upheld defendants' attempted murder convictions. We conclude there was not sufficient evidence in the record to support an instruction on the kill zone theory, and that the error requires reversal of the attempted murder convictions at issue because those convictions may have been based on the kill zone theory even though that theory was not properly applicable.

Defendants raise the additional argument that instructing pursuant to CALCRIM No. 600, the current standard instruction regarding attempted murder, violated defendants' federal constitutional rights to due process because it led the

jurors to believe they could convict defendants of the attempted murder of one victim without finding the requisite intent to kill. In light of our conclusion that the judgment must be reversed because the evidence was insufficient to support an instruction on the kill zone theory, we need not address defendants' constitutional challenge to CALCRIM No. 600.

## I. FACTS AND PROCEDURAL BACKGROUND

The convictions in this case arose from a gang-related shooting at a neighborhood block party on West Jackson Street in Rialto. Travion Bolden and Denzell Pride, the alleged attempted murder victims, both lived in apartments on West Jackson and were members of the Hustla Squad Clicc, a large Rialto-based criminal street gang. Defendants Canizales and Windfield were members of a smaller gang called Ramona Blocc that was also based in Rialto. The two gangs were rivals, and shootings between them were commonplace.

Around noon on July 18, 2008, Bolden and Pride saw Canizales at a fast-food restaurant near West Jackson. The encounter led to a brief argument between Pride and Canizales over Canizales's female companion.

Later that same day, Bolden had his own confrontation with Canizales after one member of a group of female friends with whom Bolden was socializing outside his apartment called out to Canizales to join them as he was passing by. Canizales approached and, in what one witness described as a somewhat aggressive manner, asked Bolden "what's up" and where he was from. When Bolden responded that he "didn't bang," Canizales walked away. Bolden provided a somewhat different account to an investigating officer, saying that he believed Canizales was challenging him to a fight, that Bolden responded to that

challenge by removing his shirt and approaching Canizales to fight him, and that Canizales walked away once Bolden took off his shirt. According to Bolden's trial testimony, he felt that Canizales had disrespected him and that, once Canizales had left, Bolden immediately went to find Pride to tell him what had happened. Pride quickly took off running after Canizales, with Bolden following at a slower pace behind him. The pursuit was cut short, however, when Pride's mother yelled at him to stop and he returned to where he and Bolden had been talking.

After the encounter with Bolden, Canizales walked to a nearby grocery store, from where he sent someone to summon Ramona Blocc gang leader Windfield. About 8:35 p.m., after joining Canizales outside the grocery store, Windfield spoke briefly with the driver of a vehicle that had pulled up next to them, then patted the car's trunk and said "Jackson Street" as the car drove away. Moments later, Windfield and Canizales headed toward West Jackson, skipping and strutting, throwing gang signs, and yelling "Ramona Blocc."

Meanwhile, people had begun to congregate on the 300 block of West Jackson to prepare for the neighborhood block party that night. By nightfall, there were approximately 10 to 30 or more people outside on the sidewalks and in the street, talking, dancing, and partying. Twenty-six-year-old Leica Cooksey was with a group of young women who had gathered around her parked car, dancing to the music on the car's radio.

The testimony at trial showed slightly different accounts of where the victims were located prior to the shooting. For example, Bolden testified that he and Pride were standing in the street in front of Pride's apartment on the same side of the street as Cooksey and her friends, who were about 20 feet away. Other

testimony indicated that Cooksey's group was on the side of the street opposite Pride's apartment.

Bolden testified that as he talked with Pride he noticed that an unfamiliar car had passed them several times and then parked on Willow Avenue, which runs perpendicular to the east side of West Jackson's 300 hundred block. Bolden and Pride then saw five or six men, including Canizales and Windfield, line up shoulder to shoulder near a manhole cover at the intersection between West Jackson and Willow, facing West Jackson.

The evidence at trial provided somewhat different versions of what happened next. Bolden testified that he observed Windfield pull a gun out of his waistband and attempted to pass it to Canizales, who did not take it. Bolden then heard Windfield first say either, "That's that little nigga," or, "There goes those little niggas right there," and then "Bust."[1] Sparks and the sound of gunfire followed. According to Bolden, after Windfield had fired the first shot, Pride grabbed Bolden and they ran away from the direction of the gunfire. Pride testified, however, that he was standing in front of his apartment when the first shot was fired, and that he ran to his young nieces and hurried them inside for safety.

Bolden had provided still another version of the shooting in a recorded interview by Detective Williams that occurred two years after the shooting and about one year prior to trial. In that account, Bolden told the officer he was standing inside a West Jackson apartment building's front yard gate smoking marijuana with some neighbors when he noticed an unfamiliar

---

[1] "Bust" is a slang term for "shoot."

car pass by several times. When the car's occupants got out of the vehicle on Willow Avenue and started walking, he heard Windfield say, "That's the little nigga right there." The officer asked Bolden whether Windfield was referring to him (Bolden). Bolden replied that they had seen Pride because Pride "gave it away when he started runnin' " and that was when the "gunshots came on." Pointing to a location on the investigator's map, Bolden said that Pride had been talking on his phone while standing near a parked car that was about four car lengths away from him, closer to Willow. When Bolden heard someone yell "bust," he came out from the gate to find Pride. Moments later, Bolden saw a gunshot flash and started running.

Bolden further testified that once the shooting had begun, he ran away along the sidewalk in a straight line but that Pride zig-zagged back and forth across the street, at one point running behind a bus that was parked on the same side of the street where Cooksey and her friends were dancing to her car's radio. Bolden could hear the gunfire coming their way, with bullets flying by them and "tingling through the gates." Bolden also believed, however, that Windfield could not control his gun, and he described the bullets as "going everywhere." When Windfield stopped shooting, he and Canizales ran down Willow Avenue, away from the scene.

Neither Pride nor Bolden was hit by gunfire, but one of the shots struck Cooksey in the abdomen and she later died as a result of that injury. Investigators found five expended cartridge casings at the corner of West Jackson and Willow, approximately 100 feet from where Cooksey was shot. The casings were nine millimeter and all of them had been fired from a single semi-automatic gun. A defense investigator determined

that the distance from the manhole cover on Willow to where Pride and Bolden stood when the shooting began was 160 feet.

Detectives spoke with Canizales and Windfield shortly after the shootings but the investigation stalled and no charges were filed. Meanwhile, Pride and Bolden had left the area and could not be located. About one year after the incident, however, Windfield told a family friend that he and Canizales had gone to West Jackson to shoot the Hustla Squad member who had killed his cousin. Windfield explained that a girl got in the way of his gunfire while the person he was shooting at ran away. Four months after that conversation, Windfield's friend reported the confession to police, and the investigation reopened. Although officers had difficulty locating Bolden and Pride, they eventually obtained statements from them describing the incident and implicating Canizales and Windfield in the shooting.

Canizales and Windfield were charged by amended information with the deliberate, premeditated murder of Cooksey, the deliberate, premeditated attempted murders of Bolden and Pride, and street terrorism. (Pen. Code, §§ 187, subd. (a); 664, subd. (a) and 187, subd. (a); 186.22, subd. (a).)[2] The amended information also alleged that Canizales and Windfield committed the crimes to benefit a street gang, and that a principal personally discharged a firearm causing death, within the meaning of sections 186.22, subdivision (b), and 12022.53, subdivisions (b), (c), (d), and (e)(1). Neither Canizales nor Windfield testified at trial. At the close of evidence, the

---

[2]     All further statutory references are to the Penal Code unless otherwise indicated.

court dismissed the street terrorism charge and several of the firearm enhancements in the interest of justice.

The court instructed the jury on attempted murder using CALCRIM No. 600.[3]  During closing argument, which occurred after the court had given its instructions, the prosecutor offered two theories of defendants' liability for the attempted murder of Bolden.  She argued first that the evidence showed Windfield was shooting at, and attempting to kill, both Pride and Bolden, presumably because they were members of the Hustla Squad gang.  She then described the concept of the kill zone.  The prosecutor told the jury that "[i]f they're shooting at someone and people are within the zone that they can get killed, then you're responsible for attempted murder as to the people who are within the zone of fire.  Okay.  So there were times when [Bolden] told you that he was with [Pride], near [Pride], close proximity to [Pride].  So they're both within the zone of fire, the range [of] the bullets that are coming at them."

---

[3]  The instruction provided, as relevant here, that the prosecution had to prove two elements to prove attempted murder:  "1.  The defendant took a direct but ineffective step toward killing another person; and 2. The defendant intended to kill that person [¶]  . . .  [¶]  A person may intend to kill a particular victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.'  In order to convict a defendant of the attempted murder of . . . Bolden, the People must prove that the defendant not only intended to kill . . . Pride but also either intended to kill . . . Bolden, or intended to kill everyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill . . . Pride by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder."

As relevant here, the jury found both defendants guilty of the first degree murder of Cooksey and the premeditated attempted murders of Bolden and Pride, and found as to all three counts that the offenses were committed for the benefit of a criminal street gang. The Court of Appeal reversed Canizales's first degree murder conviction of Cooksey in light of this court's decision in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*),[4] but otherwise affirmed the judgments. In upholding the attempted murder convictions, the Court of Appeal expressly disagreed with the formulation of the kill zone theory's requirements set forth in *People v. McCloud* (2012) 211 Cal.App.4th 788 (*McCloud*).

We granted review in light of the conflict in the Courts of Appeal regarding the evidentiary basis for applying, and instructing on, the kill zone theory for establishing the intent to kill element of attempted murder.

## II. DISCUSSION

### A. The kill zone theory of attempted murder liability

To prove the crime of attempted murder, the prosecution must establish "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) When a

---

[4] *Chiu* held that an aider and abettor's liability for first degree premeditated murder cannot be based on the natural and probable consequences doctrine. (*Chiu, supra,* 59 Cal.4th at pp. 158-159.) In reversing Canizales's conviction, the Court of Appeal explained that it was unable to conclude beyond a reasonable doubt that the jury based its first degree murder verdict on the legally valid theory that he aided and abetted premeditated murder.

single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be "transferred" from one attempted murder victim to another under the transferred intent doctrine. (*People v. Bland* (2002) 28 Cal.4th 313, 327-328 (*Bland*).)

Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime. (*People v. Sanchez* (2016) 63 Cal.4th 411, 457; *People v. Smith* (2005) 37 Cal.4th 733, 741 (*Smith*); *People Lashley* (1991) 1 Cal.App.4th 938, 945-946.)

In *Bland, supra,* 28 Cal.4th 313, this court expressly embraced the concept of a *concurrent* intent to kill as a permissible theory for establishing the specific intent requirement of attempted murder. Under that theory, which was first articulated by the Maryland high court in *Ford v. State* (Md. 1993) 625 A.2d 984 (*Ford*), the nature and scope of the attack directed at a primary victim may raise an inference that the defendant " 'intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.' " (*Bland,* at p. 329, quoting *Ford*, at p. 1000.) Quoting extensively from *Ford*, the *Bland* decision illustrated the notion of a concurrent intent to kill with a hypothetical scenario in which the defendant " 'escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or explosive device.' " (*Bland*, at p. 330, quoting *Ford*, at p. 1001.) On such facts, " 'the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death.' " (*Ibid*.) Again quoting from *Ford*, we explained that " '[w]here

the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.' " (*Ibid*.)

*Bland* applied what is now commonly referred to as the "kill zone" theory to uphold the attempted murder convictions in that case. The record there showed that the defendant and a fellow gang member approached a car in which a rival gang member was sitting in the driver's seat and opened fire with a .38-caliber handgun, shooting numerous rounds both into the vehicle and at the vehicle as it drove away. The driver was killed and his two passengers, who were not gang members, were wounded. (*Bland, supra*, 28 Cal.4th at p. 318.) We concluded that the evidence "virtually compelled" a finding that even if the defendant primarily intended to kill the rival gang member, he also, concurrently, intended to kill the passengers in the car, or, at the least, intended to create a zone of fatal harm. (*Id*. at p. 333.)

*Bland*'s adoption of the kill zone theory meant that a prosecutor charging attempted murder in a multi-victim case had an additional, alternative ground by which to prove the requisite intent to kill. Under appropriate facts, the prosecutor could attempt to show either that the defendant's intent to kill one or more alleged victims arose independently of his actions toward any other victim, or that the defendant's intent to kill an untargeted victim arose concurrently with his intent to kill a primary target.

After the opinion in *Bland*, this court issued a series of decisions in which the defendant had been convicted of one or more counts of attempted murder based on the act of shooting a

single bullet in the direction of two or more individuals. In each of these cases, we had occasion to discuss the application of the kill zone theory and found it either irrelevant or inapplicable to the facts presented.

*Smith, supra*, 37 Cal.4th 733, declined to analyze the defendant's sufficiency of the evidence claim under the kill zone rationale, finding no merit to the defendant's assertion that all single-bullet cases involving more than one victim must be assessed under that theory. Examining the totality of the circumstances shown by the evidence, our decision in *Smith* concluded instead that the defendant was properly convicted of two counts of attempted murder for having fired at close range a single bullet at a former girlfriend seated in the front seat of her car and the infant who was in a car seat immediately behind her, both of whom were in his direct line of fire. (*Id*. at pp. 744-746.)

In a dissenting opinion in *Smith*, Justice Werdegar disagreed that the evidence was sufficient to uphold the conviction for the attempted murder of the infant. The dissent concluded that the record did not support the Attorney General's argument that the defendant's firing of a single bullet in the direction of his former girlfriend created a zone of fatal harm around her such that it might be inferred that he intended to ensure her death by killing the infant as well. (*Id*. at pp. 755-757 (dis. opn. of Werdegar, J.).)

Subsequently, in *People v. Stone* (2009) 46 Cal.4th 131 (*Stone*), this court agreed with the Court of Appeal that the trial court should not have instructed on the kill zone theory because that theory was not implicated in that case. There, the defendant had been charged with only a single count of

attempted premeditated murder for shooting at someone who was standing in a group of 10 rival gang members about 60 feet away from the defendant. (*Id.* at pp. 135, 138.) We found the instructional error on the theory harmless, however, and upheld the attempted murder conviction, notwithstanding the prosecutor's concession that he had not proved that the defendant specifically intended to kill the victim named in the charging document. In affirming the judgment, we held that a defendant who fires into a group of people intending to kill one of them, but not knowing or caring which one he or she kills, can be convicted of attempted murder because there is no requirement that a defendant intend to kill a specific target, so long as he or she intended to kill someone. (*Id.* at pp. 139-140.) We noted that although "difficulties can arise . . . regarding *how many* attempted murder convictions are permissible" in some cases, we were not required to confront that difficulty in *Stone* because the defendant there was charged with only one count of attempted murder. (*Id.* at pp. 140-141, citing *Bland*, *supra*, 28 Cal.4th at pp. 328-329.)

Finally, in *People v. Perez* (2010) 50 Cal.4th 222 (*Perez*), this court reversed seven of the defendant's eight attempted murder convictions that were based on his firing a single shot from 60 feet away into a group comprised primarily of police officers who were standing in close proximity to one another. In examining the defendant's challenge to his convictions, *Perez* considered whether the kill zone theory applied. We concluded that the nature and scope of the defendant's attack on the group had not created a zone of fatal harm around them and that *Bland* did not apply. (*Id.* at p. 232.)

In the course of concluding that the kill zone theory was not supported by the evidence adduced at trial, our decisions in

*Stone* and *Smith* briefly summarized the kill zone theory of attempted murder liability. *Stone* explained, for example, that the kill zone theory "addresses the question of whether a defendant charged with the murder or attempted murder of an intended target can *also* be convicted of attempting to murder other, nontargeted, persons." (*Stone, supra,* 46 Cal.4th at p. 138.) For its part, *Smith* pointed out that "*Bland* simply recognizes that a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm." (*Smith, supra*, 37 Cal.4th at pp. 745-746.)

As previously explained, the kill zone theory embraced by *Bland* originated from the concept of concurrent intent first articulated by the Maryland Court of Appeals in *Ford, supra,* 625 A.2d 984. *Ford*'s discussion of the concurrent intent theory was not the basis on which the court resolved the issue presented in that case, however. Rather, it was dictum in a discussion eschewing reliance on a transferred intent theory of liability for inchoate crimes. An earlier decision by the same court, *State v. Wilson* (Md. 1988) 546 A.2d 1041 (*Wilson*), had applied transferred intent to uphold a conviction for the attempted murder of a bystander who was shot during the defendants' attempt to kill a targeted victim. *Ford* disapproved the reasoning of *Wilson*. But the court in *Ford* justified *Wilson*'s result on the ground that the convictions in *Wilson* could be

upheld on a theory of concurrent intent. That is, the record supported an inference of the defendants' concurrent intent to kill both the primary victim and the bystander based on evidence that the defendants had fired numerous shots toward both victims. (*Ford*, at p. 1001.) As *Ford* explained, the factfinder could conclude that by attempting to kill their target by firing multiple bullets from two handguns, the defendants intended to create a " 'kill zone' " around the target from which it could be inferred that the defendants intended to kill everyone in the direct path of their bullets. (*Ibid.*) *Ford* found that the bystander was "obviously" in the "direct line of fire and the evidence permitted finding concurrent intent to kill everyone in the path of the bullets." (*Ibid.*)

In concluding that *Wilson* correctly upheld the defendants' attempted murder convictions, the *Ford* decision spoke in terms of the victims being in the "direct line of fire." (*Ford, supra*, 625 A.2d at p. 1001.) But its description of the concurrent intent theory, generally, was not so limited. *Ford* explained that when "[t]he defendant has intentionally created a 'kill zone' to ensure the death of his primary victim, . . . the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim." (*Ibid.*)

A decade after *Ford*'s dictum, in *Harrison v. State* (Md. 2004) 855 A.2d 1220 (*Harrison*), the Maryland Court of Appeals expressly adopted the concurrent intent theory as a basis of liability for crimes such as attempted murder. Drawing on language in *Ford*, the *Harrison* decision observed that the "essential questions" in a concurrent intent analysis focus "on the 'means employed to commit the crime [against the primary

victim]' and the 'zone of harm around [that] victim.' " (*Harrison*, at p. 1230.)

Justice Werdegar's dissenting opinion in *Smith, supra*, 37 Cal.4th 733, applied *Harrison*'s two-part inquiry to reject the Attorney General's argument that the conviction for the attempted murder of the infant in the car seat could be upheld under the kill zone theory. Slightly rephrasing that test, the dissenting opinion asked "(1) whether the fact finder can rationally infer from the type and extent of force employed in the defendant's attack on the primary target that the defendant intentionally created a zone of fatal harm, and (2) whether the nontargeted alleged attempted murder victim inhabited that zone of harm." (*Smith*, at pp. 755-756.)

*Harrison*'s two-part inquiry, as rephrased in the dissenting opinion in *Smith*, accurately reflects this court's decision in *Bland* and the underpinnings of the kill zone theory. As previously noted, *Bland* quoted extensively from the *Ford* decision, on which *Harrison* was likewise based. And *Harrison*'s inquiry is consistent with the only decision by this court subsequent to *Bland* that analyzed the record under the kill zone theory. In concluding that the kill zone theory did not apply, we observed in *Perez, supra*, 50 Cal.4th 222, 232, that "*Bland*'s kill zone theory of multiple attempted murder is necessarily defined by the nature and scope of the attack."

The two-part standard for application of the kill zone theory set forth in Justice Werdegar's dissenting opinion in *Smith* thus provides a helpful basis for a clear and workable test. But the potential for the misapplication of the kill zone theory, as evidenced by prior appellate cases, illustrates the importance of more clearly defining the kill zone theory in future

cases. The kill zone theory looks to circumstantial evidence to support a permissive inference regarding a defendant's intent. This is not unusual. As we have described on many occasions, intent to kill often must be inferred from circumstantial evidence surrounding the crime. (See, e.g., *People v. Sanchez, supra*, 63 Cal.4th at p. 457.) And when the prosecution's theory substantially relies on circumstantial evidence, a jury must be instructed that it cannot find guilt based on circumstantial evidence when that evidence supports a reasonable conclusion that the defendant is not guilty. (*People v. Bender* (1945) 27 Cal.2d 164, 175, abrogated on another ground by *People v. Lasko* (2000) 23 Cal.4th 101, 110; see also CALCRIM No. 225 [directing jury that circumstantial evidence may support required intent if "the only reasonable conclusion supported by the circumstantial evidence" is that defendant had the required intent, and that jury must conclude intent was not proved when there are "two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports" a determination that defendant did not have the required intent].) As past cases demonstrate, however, even when a jury is otherwise properly instructed on circumstantial evidence and reasonable doubt, the potential for misapplication of the kill zone theory remains troubling.

We therefore conclude that the kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm — that is, an area in which the defendant intended to kill everyone

17

present to ensure the primary target's death — around the primary target; and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm.

In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory. As the Court of Appeal recently explained in *People v. Medina* (2019) 33 Cal.App.5th 146, at page 156 (*Medina*), the kill zone theory does not apply where "the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given." We believe our formulation of the kill zone theory here guards against the potential misapplication of the theory, and is consistent with *Bland* and the general principles discussed above regarding circumstantial

evidence and the prosecution's burden of proving each element of an offense beyond a reasonable doubt.[5]

We emphasize that going forward trial courts must exercise caution when determining whether to permit the jury to rely upon the kill zone theory. Indeed, we anticipate there will be relatively few cases in which the theory will be applicable and an instruction appropriate. Trial courts should tread carefully when the prosecution proposes to rely on such a theory, and should provide an instruction to the jury only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm. The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction.

Relying on language in *Stone, supra*, 46 Cal.4th 131, the Attorney General and amicus curiae assert that for the kill zone theory to apply it is not necessary that the defendant have a

---

[5]    Past appellate court opinions articulating the kill zone theory are incomplete to the extent that they do not require a jury to consider the circumstances of the offense in determining the application of the kill zone or imply that a jury need not find a defendant intended to kill everyone in the kill zone as a means of killing the primary target, even if their description of the theory is otherwise consistent with our opinion here. (See, e.g., *Medina, supra*, 33 Cal.App.5th at p. 170; *People v. Stevenson* (2018) 25 Cal.App.5th 974, 985-987; *People v. Windfield* (2016) 3 Cal.App.5th 739, 754-761; *People v. Falaniko* (2016) 1 Cal.App.5th 1234, 1243-1244; *People v. Cardona* (2016) 246 Cal.App.4th 608, 614-615; *McCloud, supra*, 211 Cal.App.4th at pp. 798-800.)

primary target. They have misread our decision. *Stone* does say that "[a]lthough a primary target often exists and can be identified, one is not required." (*Id.* at p. 140.) In making that observation, however, our opinion in *Stone* was not referring to the kill zone theory. Indeed, we concluded that the jury there should *not* have been given a kill zone instruction because that theory "addresses the question of whether a defendant charged with the murder or attempted murder of an *intended target* can also be convicted of attempting to murder other, *nontargeted*, persons." (*Id.* at p. 138, italics added and omitted.) In *Stone*, the intent-to-kill element of the attempted murder charge was established because the evidence supported an inference that the defendant intended to kill *someone* in the group. In *Smith*, *supra*, 37 Cal.4th 733, evidence that the defendant discharged a lethal firearm at two victims who were seated directly in his line of fire supported an inference that he acted with intent to kill both victims. (*Id.* at p. 743.)

*Stone* and *Smith* do make clear there are evidentiary bases, other than the kill zone theory, on which a factfinder can infer an intent to kill for purposes of attempted murder liability that do not depend on a showing that the defendant had a primary target (for example, when a terrorist places a bomb on a commercial airliner intending to kill as many people as possible without intending to kill a specific individual). (*Stone, supra*, 46 Cal.4th at p. 140; *Smith*, *supra*, 37 Cal.4th at p. 743.) When the kill zone theory is used to support an inference that the defendant concurrently intended to kill a nontargeted victim, however, evidence of a primary target is required. As we stated in *Bland*, the kill zone theory is one of concurrent intent based on a reasonable inference a jury may draw under the facts of a particular case. (*Bland*, *supra*, 28 Cal.4th at pp. 330-331,

20

331, fn. 6.) As the Court of Appeal correctly observed in *Medina*, *supra*, 33 Cal.App.5th at page 155, "[w]ithout a primary target, there cannot be concurrent intent because there is no primary intent to kill as to which the intent to kill others could be concurrent."

Defendant Windfield asserts that CALCRIM No. 600, the standard instruction on attempted murder that was given in the case, does not adequately explain the kill zone theory. We agree that, when a kill zone instruction is legally warranted and in fact provided, the standard instruction should be revised to better describe the contours and limits of the kill zone theory as we have laid them out here.

### 1. *The kill zone instruction was not sufficiently supported in the present matter*

As we shall explain, we conclude that the evidence in this case was insufficient to warrant the trial court's instruction on the kill zone theory in connection with the count charging the attempted murder of Bolden.

" 'It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference. [Citation.]' [Citation.]" (*People v. Saddler* (1979) 24 Cal.3d 671, 681; accord *People v. Clark* (2016) 63 Cal.4th 522, 605.)

Here, there was substantial evidence in the record from which it could be inferred that Pride was defendants' primary target in the shooting, and no party argues otherwise. Pride was a known member of Hustla Squad, and Windfield had admitted to a family friend that on the night in question he and Canizales had gone to West Jackson to "get a Hustla Squad" gang member

who had killed his cousin.  Moreover, Pride and Canizales had engaged in a verbal altercation around noon on the day of the shooting.  Finally, the evidence showed that after defendants and their companions had lined up along Willow Avenue facing West Jackson Street, where Pride and Bolden were standing together on the sidewalk, Winfield yelled, "That's that little nigga.  Bust" — and then opened fire.

But an instruction on the kill zone theory would have been warranted in this case only if there was substantial evidence in the record that, if believed by the jury, would support a reasonable inference that defendants intended to kill everyone within the "kill zone."  To qualify, the record would need to include (1) evidence regarding the circumstances of defendants' attack on Pride that would support a reasonable inference that defendants intentionally created a zone of fatal harm around him, and (2) evidence that Bolden was located within that zone of fatal harm.  Taken together, such evidence would permit a finding that defendants harbored the requisite intent to kill Bolden because he was within the zone of fatal harm that defendants intended to create around Pride.

The Attorney General argues the evidence is sufficient to support a reasonable inference that defendants intentionally created a zone of fatal harm around Pride because, like in *Bland*, the five shots Windfield fired at Pride (the primary target) were enough to kill everyone in that zone.  We conclude, however, that the evidence concerning the circumstances of the attack (including the type and extent of force used by Windfield) was not sufficient to support a reasonable inference that defendants intended to create a zone of fatal harm around a primary target.

The Attorney General is correct that in *Harrison* Maryland's high court observed that "courts have permitted an inference that the defendant created a kill zone when a defendant . . . fired multiple bullets at an intended target." (*Harrison, supra*, 855 A.2d at p. 1231.) For that proposition, *Harrison* described the facts of a number of multiple-shot cases that involved application of the kill zone theory. For example, *Harrison* pointed out that in *Wilson, supra*, 546 A.2d at page 1042, the defendants had fired " 'multiple bullets' " from two handguns. (*Harrison*, at p. 1231.) Likewise in *Bland, supra*, 28 Cal.4th at page 331, *Harrison* observed, the defendant and his cohort had fired a " 'flurry of bullets' " at the fleeing car. (*Harrison*, at p. 1231.)

But a closer examination of the decisions relied upon by *Harrison* to illustrate its point reveals that the number of shots fired, although relevant to the inquiry, is not dispositive. Rather, the number of shots fired is simply one of the evidentiary factors to consider when assessing whether the type and extent of the defendant's attack supports instruction on the kill zone theory. (See *People v. Vang* (2001) 87 Cal.App.4th 554, 564 [the placement of the shots, the number of shots, and the use of high-powered wall-piercing weapons created a reasonable inference that the defendants intended to kill every living being inside the residences at which they shot]; see also *Washington v. United States* (D.C. Ct.App. 2015) 111 A.3d 16, 24 [the court's concurrent intent instruction was supported by evidence that the defendant stood 21 feet away and fired 10 gunshots at four people in close proximity to one another, hitting three of them].)

Notably, in each of the multi-shot cases cited in *Harrison*, the defendants opened fire while in close proximity to the area surrounding their intended target. In *Bland*, for example, the

defendant approached the driver's side of the victims' car and started shooting into the vehicle, then fired at the car as it started to drive away. (*Bland, supra*, 28 Cal.4th at p. 318.) Similarly, in *Wilson*, the defendants engaged in a heated verbal argument with a man. After threatening to pistol whip him, the defendants then drew their handguns and opened fire on their target, missing him but hitting a bystander who was near both defendants and their target. (*Wilson, supra*, 546 A.2d at p. 1042.)

By contrast, here the evidence at trial showed that Windfield attacked his target by firing five bullets from a nine-millimeter handgun at a distance of either 100 or 160 feet away. Moreover, the attack occurred at a block party on a wide city street, not in an alleyway, cul de sac, or some other area or structure from which victims would have limited means of escape. As Bolden described it, the bullets were "going everywhere" and "tingling through the gates" as he and Pride ran down the street away from the gunfire after the first shot was fired.

Even accepting as more credible the prosecution's evidence that Windfield was 100 feet rather than 160 feet away from Pride and Bolden when he first fired in their direction, we conclude that a factfinder could not reasonably infer defendants intended to create a zone of fatal harm around Pride based on the record in this case. The evidence presented here showed that from a substantial distance Windfield shot five bullets in the direction of a target who immediately ran down a city street after the first shot was fired. This evidence was insufficient to support instruction on the kill zone theory.

We emphasize that the determination whether substantial evidence supports instruction on the kill zone theory is based on evidence regarding the circumstances of the attack on the primary target, from which the defendant's intent to create a zone of fatal harm may be inferred. Such a determination does not turn on the effectiveness or ineffectiveness of the defendant's chosen method of attack. But whether the inference reasonably could be drawn in this particular case is at least informed by evidence that neither Pride nor Bolden was hit by any of the shots fired by Windfield. This evidence — when viewed in conjunction with evidence regarding the limited number of shots fired, defendants' lack of proximity to Pride, and the openness of the area in which the attack occurred — further diminishes any inference that defendants intended to create a zone of fatal harm around Pride.

Because we conclude that the evidence here is insufficient to support a finding that defendants intended to create a zone of fatal harm, we have no occasion to determine the scope of any such zone given these facts. In cases where substantial evidence exists to support a finding that the only reasonable inference is that a zone of fatal harm has been created, the jury is to consider the circumstances of the attack, including the type and extent of force used during the attack, to determine the scope of that zone and whether the alleged victim was within the zone.[6]

---

[6] Defendant Canizales additionally argues that an aider and abettor cannot be held liable for attempted murder under the kill zone theory because doing so would improperly require the jury to attribute the shooter's intent to create a zone of fatal harm to the aider and abettor. Because Canizales did not raise this claim until he filed his notice of supplemental authorities,

### 2. *The error in instructing on the kill zone theory was prejudicial*

We have concluded above that there was insufficient evidence in the record to support the trial court's instruction on the kill zone theory. For the reasons provided below, we conclude that the court's error in instructing on that theory requires reversal.

As previously discussed, the jury was instructed on two theories of liability in connection with the count charging the attempted murder of Bolden. The jury was told that it could return a verdict of guilt on that count if it found either (1) that defendants intended to kill Bolden specifically, or (2) that defendants intended to kill Pride and at the same time intended to kill everyone "in a particular zone of harm or 'kill zone.'" The Attorney General argues that because the jury could properly have based the attempted murder convictions of Bolden on the first theory, the circumstance that the trial court should not have instructed on the "kill zone" theory because there was insufficient evidence to support that theory does not warrant reversal of those attempted murder convictions. The Attorney General maintains that under this court's decision in *People v. Guiton* (1993) 4 Cal.4th 1116, 1130 (*Guiton*), the applicable harmless error standard that applies in this setting is the ordinary, less demanding standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836-837, and that under that standard the trial court error was not prejudicial.

In support of the application of the *Watson* standard, the Attorney General points to our observation in *Guiton* that when

and because we reverse his attempted murder conviction on other grounds, we do not address his claim here.

a trial court instructs the jury on an alternative theory that is improper simply because that alternative theory is not factually supported by the evidence adduced at trial, the factual inadequacy is generally something that "the jury is fully equipped to detect." (*Guiton, supra,* 4 Cal.4th at p. 1129.) For this reason, we stated in *Guiton* that "instruction on an unsupported theory is prejudicial only if that theory became the sole basis of the verdict of guilt; if the jury based its verdict on the valid ground, or on both the valid and the invalid ground, there would be no prejudice, for there would be a valid basis for the verdict. . . . [T]he appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*Id.* at p. 1130.)

At the same time, however, we also explained in *Guiton* that a different prejudice inquiry applies in cases "in which 'a particular theory of conviction . . . is contrary to law,' or, phrased slightly differently, cases involving a '*legally* inadequate theory' . . . ." (*Guiton, supra,* 4 Cal.4th at p. 1128.) In determining whether a legally inadequate theory was conveyed to the jury here, we must ask whether there is a " 'reasonable likelihood' " that the jury understood the kill zone theory in a legally impermissible manner. (*People v. Kelly* (1992) 1 Cal.4th 495, 525, quoting *Estelle v. McGuire* (1991) 502 U.S. 62, 72.) In doing so, we consider the instructions provided to the jury and counsels' argument to the jury. (See, e.g., *People v. Nelson* (2016) 1 Cal.5th 513, 545.)

In light of the instruction provided to the jury regarding the attempted murder of Bolden and the prosecutor's closing argument, the error here cannot be described merely as the

presentation of a factually unsupported theory. In relevant part, the instruction informed the jury that to convict defendants of attempted murder it must find "[t]he defendant took a direct but ineffective step toward killing another person" and "intended to kill that person." It further explained that "[a] person may intend to kill a particular victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.'" The instruction indicated that the People must prove "that the defendant[s] not only intended to kill Denzell Pride but also either intended to kill Travion Bolden, or intended to kill everyone within the kill zone." Finally, the instruction directed the jury that if it had "a reasonable doubt whether the defendant[s] intended to kill Travion Bolden or intended to kill Denzel Pride by killing everyone in the kill zone," it must return verdicts of not guilty. Beyond its reference to a "particular zone of harm," the instruction provided no further definition of the term "kill zone." Nor did the instruction direct the jury to consider evidence regarding the circumstances of defendants' attack when determining whether defendants "intended to kill Denzel Pride by killing everyone in the kill zone."

The prosecutor's description of the kill zone theory given during closing argument substantially aggravated the potential for confusion. The prosecutor told the jury that under the kill zone theory, when a defendant is "shooting at someone and people are within the zone that they can get killed, then [the defendant] is responsible for attempted murder as to the people who are within the zone of fire." Pointing to Bolden's testimony that he was at times in close proximity to Pride, the prosecutor argued that they were "both within the zone of fire, the range [of] the bullets that are coming at them." The prosecutor's

28

definition of the kill zone as an area in which people "can get killed" or are in a "zone of fire" was significantly broader than a proper understanding of the theory permits. Indeed, it essentially equated attempted murder with implied malice murder. (See *Medina, supra*, 33 Cal.App.5th at p. 155 [holding that allowing the kill zone instruction based on an asserted natural and probable consequence that anyone within a zone of harm could die "replaces the specific intent/express malice required for an attempted murder conviction with conscious disregard for life/implied malice, which *Bland* makes clear cannot support an attempted murder conviction"].) Thus, the prosecutor's argument had the potential to mislead the jury to believe that the mere presence of a purported victim in an area in which he or she could be fatally shot is sufficient for attempted murder liability under the kill zone theory. So misled, the jury might well have found factual support for what was effectively an "implied malice" theory of attempted murder without detecting the legal error. (See *Guiton, supra*, 4 Cal.4th at p. 1128.)

In light of these facts, we conclude that there is a reasonable likelihood that the jury understood the kill zone instruction in a legally impermissible manner. The court's error in instructing on the factually unsupported kill zone theory, combined with the lack of any clear definition of the theory in the jury instruction as well as the prosecutor's misleading argument, could reasonably have led the jury to believe that it could find that defendants intended to kill Bolden based on a legally inaccurate version of the kill zone theory — that is, that defendants could be found guilty of the attempted murder of Bolden if Windfield shot at Pride knowing there was a substantial danger he would also hit Bolden.

These circumstances make this case similar to *People v. Green* (1980) 27 Cal.3d 1 (*Green*), a case discussed and analyzed in some detail in this court's decision in *Guiton*, *supra*, 4 Cal.4th at pages 1121-1122, 1128-1129. In *Green*, the defendant was convicted of charges including first degree murder, kidnapping, and a kidnapping special circumstance. (*Green*, at pp. 11-12.) Under the jury instructions provided, the jury could have based its kidnapping verdict on any one of three distinct segments of asportation, including one incident where the victim travelled only 90 feet. (*Id.* at pp. 62-63.) In instructing the jury on the elements of kidnapping, the trial court informed the jury only that asportation must be " 'for a substantial distance, that is, a distance more than slight or trivial.' " (*Id.* at p. 68.) This court in *Green*, after determining that the 90-foot asportation was "insufficient as a matter of law" to support the kidnapping conviction (*id.* at p. 67), held that the instructional error in permitting the jury to base its verdict on that asportation was prejudicial and required reversal of the kidnapping conviction and the related kidnapping special circumstance (*id.* at p. 74).

In explaining the reasoning underlying the reversal of the kidnapping conviction in *Green*, we observed in our subsequent decision in *Guiton* that whereas "a jury would be well equipped to analyze the evidence and determine whether the victim had been asported, and to determine the distance of the asportation[,] [t]he jury would, however, not be equipped to determine whether, as a matter of *law*, 90 feet is insufficient. A reasonable jury, given no specific guidance regarding the required distance [citation], could have found 90 feet to be sufficient, and could have relied on that segment of asportation in its verdict. That being the case, reversal was appropriate." (*Guiton*, *supra*, 4 Cal.4th at p. 1128.)

Here, as in *Green*, the jury was provided an instruction regarding the kill zone theory but no adequate definition to enable the jury to determine whether the theory was properly applicable. This error was one of federal constitutional magnitude. (See *People v. Lee* (1987) 43 Cal.3d 666, 672.) In *Guiton*, we did not establish the precise standard of review for cases governed by *Green*. (*Guiton*, 4 Cal.4th at pp. 1130-1131.) Although we observed that in cases like *Green* "the general rule has been to reverse the conviction because the appellate court is ' "unable to determine which of the prosecution's theories served as the basis for the jury's verdict" ' " (*Guiton*, at p. 1130), we also noted that "even this rule has not been not universal." (*Ibid.*) We currently are considering in *People v. Aledamat*, review granted July 5, 2018, S248105, whether the appropriate standard for prejudice in this setting is the test established in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), or an even more stringent test requiring reversal unless there is a basis in the record to find that the jury actually relied on the valid theory.

Here, we need not resolve the question posed in *Aledamat* because we conclude that the error in this case was prejudicial under even the *Chapman* standard. Applying that test, we ask "whether it is clear beyond a reasonable doubt that a reasonable jury would have rendered the same verdict absent the error." (*People v. Merritt* (2017) 2 Cal.5th 819, 831, citing *Neder v. United States* (1999) 527 U.S. 1, 18.) In making that determination, we examine the entire record. (See *Green*, *supra*, 27 Cal.3d at p. 71.) Considering the evidence regarding the shooting, the prosecutor's argument, and the jury's questions during deliberation, we conclude that the attempted murder convictions as to Bolden must be reversed.

First, although there was strong evidence that Pride was defendants' primary target, there was conflicting evidence regarding whether defendants also intended to kill Bolden specifically. On the one hand, Detective Williams testified that Pride indicated to him during a pretrial interview that the shooter was targeting Bolden, not him. Detective Williams's interview with Bolden, when Bolden described his earlier confrontation with Canizales, likewise suggested that Bolden believed Windfield was shooting at him. The evidence also showed Bolden was a member of a rival gang and that defendants, who were members of the Ramona Blocc gang, were seeking to retaliate against the Hustla Squad gang for the fatal shooting of Windfield's cousin. Taken together, this evidence indicates that the jury *could* have concluded that defendants had the requisite intent to kill Bolden specifically.

But other evidence leads us to conclude that it is not clear beyond a reasonable doubt that a reasonable jury would have come to that determination. Bolden told Detective Williams and testified at trial that Windfield was not talking about him when he said, "There goes that little nigga," because Windfield did not know him, and that defendant saw Pride, who "gave it away" by running.[7] Bolden testified he thought Windfield was shooting

---

[7] The exchange between Detective Williams and Bolden further supports this conclusion: "[Det. Williams]: They was talkin' about you? [¶] [Bolden]: They saw Denzel [Pride]. 'Cause he the one . . . he was the first one to run! [¶] . . . [¶] [Det. Williams]: Okay, so you start lookin' then when you realized it was them, it was too late for you to tell them [Pride and the others] . . . [¶] [Bolden]: And plus . . . and plus Denzel already gave it away when he start runnin'. That's why everybody was lookin' like why he runnin'. And . . . [¶] [Det.

at Pride because Bolden "would have got hit first" if Windfield was shooting at him. When Bolden described the gunshots he stated the bullets were "tingling through the gates" and "going everywhere" because Windfield could not control his gun. There was also testimony at trial that Windfield later admitted to a family friend that "the guy he was shooting at ran and the girl got in the way." Based on the evidence alone, then, it is not clear beyond a reasonable doubt that a reasonable jury would conclude defendants intended to kill Bolden specifically.

Next, the jury instructions and the prosecutor's argument further support a finding of prejudice. As detailed, both the prosecutor's closing argument and the attempted murder instruction given in connection with the charge involving Bolden had the potential to cause confusion regarding the application of the kill zone theory. To be sure, the instructions made clear there were two theories for finding criminal liability with regard to the attempted murder of Bolden and plainly informed the jury that defendants could be liable if they intended to kill Bolden specifically. The prosecutor also emphasized both theories in her argument, and strenuously argued the theory that defendants specifically targeted both Bolden and Pride. That portion of her argument emphasized that Bolden and Pride's gang affiliation provided the motive for the shooting because defendants were "trying to kill Hustla Squad." She also emphasized Bolden's pretrial statements to Detective Williams that Windfield was shooting at him as evidence that showed

_____

Williams]: So how did Denzel . . . ? [¶] [Bolden]: . . . that's when the gunshots come on."

defendants had in fact "shot at both of them."[8]  But this does not overcome the potential for confusion created by the attempted murder instruction in combination with the prosecutor's argument.   Taken together, it cannot be said beyond a reasonable doubt that a reasonable jury would conclude defendants targeted Bolden specifically.

The jury's questions during deliberations are also instructive.  The jury here did not ask questions directed solely to the kill zone theory or that otherwise suggested it had relied solely on the kill zone theory to find defendants guilty of the attempted murder of Bolden.   (Cf. *In re Martinez* (2017) 3 Cal.5th 1216, 1227 [jury's mid-deliberations note seeking clarification of the standard instruction on aider and abettor liability, and the court's response to that inquiry, suggested that the jury may have found the defendant guilty of murder based on the invalid theory that the murder was a natural and probable consequence of the assaults that preceded the shooting].)  But, as defendants point out, the jury did request a readback of Bolden's testimony to the effect that "[t]hey weren't shooting at me."  In the portion of Bolden's testimony that the

---

[8]     The prosecutor argued in full:  "Attempt murder goes to both Count 2 and 3.  They tried to kill someone, but they weren't successful. . . .   And they intended to kill that person.  Well, they're both Hustla Squad.  You have a motive of why they're out there.  They are trying to kill Hustla Squad, right?  [¶]  Now [Bolden] told you very clearly they were shooting at [Pride] but [Pride] turned around and ran and they're shooting at him.  And then at one point [Bolden] tells you he runs out and they're shooting at him.  And you see that in his video statement with Detective Williams.  So they shot — [defendant Windfield] shot at both of them.  That's why you have a count for each one of the attempts."

jury asked to rehear, the prosecutor asked Bolden whether Windfield was shooting at him. Bolden answered, "To be honest, I don't feel he was shooting at me because I was in front of [Pride]. . . . But he was shooting our way." When asked to confirm that he had told Detective Williams in a pretrial interview that Windfield was shooting at him, however, Bolden said he "couldn't remember that part" but that he "probably did." The request for a readback is not dispositive, but it suggests the jurors at one point were focused on testimony that would have supported the theory that defendants did *not* target Bolden specifically.

The jury's findings on sentencing enhancement allegations are also relevant to our consideration. The Attorney General asserts that the jury's true findings as to the allegation that defendants acted willfully, deliberately, and with premeditation in attempting to murder Bolden (see §§ 664, subd. (a) and 187, subd. (a)) show the jury necessarily determined that defendants acted with the specific intent to kill. The jury could not have found premeditation and deliberation without also having determined that defendants had formed the intent to kill. (See *People v. Catlin* (2001) 26 Cal.4th 81, 151.) We agree with Windfield, however, that the true findings regarding the allegation that defendants acted with deliberation and premeditation in attempting to murder Bolden do not affect our determination. As we explained *ante*, the kill zone theory permits the jury to infer that the defendant harbored the requisite specific intent to kill the primary target *and* everyone within the zone of fatal harm. Thus, the jury would have found a specific intent to kill were it to have relied solely on the kill zone theory of attempted murder liability.

Nor are we persuaded that the jury's true findings concerning the separate gang enhancement allegation necessarily leads to the conclusion that the jury did not rely on the kill zone theory. The jury determined that defendants committed the attempted murder of Bolden to benefit the Ramona Blocc gang. Those findings could suggest that the jury accepted the prosecutor's alternate theory that defendants intended to kill both Pride and Bolden because they belonged to the Hustla Squad gang. But the findings could also suggest that, relying on the kill zone theory, the jury found that defendants created a zone of fatal harm in which they intended all persons would be killed for the benefit of the gang.

Having examined the entire record, we conclude that it is not clear beyond a reasonable doubt that a reasonable jury would have returned the same verdict absent the error. Reversal is required on the attempted murder counts regarding Bolden.

## B. Defendants' challenges to CALCRIM No. 600

Defendants argue that the paragraph relating to the kill zone theory in CALCRIM No. 600, the standard instruction regarding attempted murder given in their case, erroneously permitted the jury to return a verdict of guilt on the count charging the attempted murder of the nontargeted victim without a finding of the requisite element of intent to kill, in violation of their right to due process. Because we conclude that the instruction should not have been given and that doing so prejudiced defendants, we need not reach this separate constitutional challenge.

### III. DISPOSITION

The judgment of the Court of Appeal is reversed as to the attempted murder convictions regarding Bolden.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Canizales

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 229 Cal.App.4th 820
**Rehearing Granted**

_____

**Opinion No.** S221958
**Date Filed:** June 24, 2019

_____

**Court:** Superior
**County:** San Bernardino
**Judge:** Steven A. Mapes

_____

**Counsel:**

Christine Vento, under appointment by the Supreme Court, for Defendant and Appellant Michael Raphael Canizales.

David P. Lampkin, under appointment by the Supreme Court, for Defendant and Appellant KeAndre Dion Windfield.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Julie L. Garland, Assistant Attorney General, Steven T. Oetting, Deputy State Solicitor General, Andrew Mestman, Lise Jacobson and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

Mitchell Keiter as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Christine Vento
P.O. Box 691071
Los Angeles, CA  90069-9071
(323) 936-5113

David P. Lampkin
P.O. Box 2541
Camarillo, CA  93011-2541
(805) 389-4388

Paige B. Hazard
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 645-2166