Filed 6/22/21  P. v. Bon CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. OSCAR ABRAHAM BON, Defendant and Appellant. | F078752 (Super. Ct. No. MCR040757) **OPINION** |

APPEAL from a judgment of the Superior Court of Madera County.  Mitchell C. Rigby, Judge.

Diane Nichols, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Angelo S. Edralin, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Oscar Abraham Bon appeals after remand, in which the trial court exercised its discretion and maintained various gun enhancements as previously ordered.  On appeal, Bon argues that the scope of the remand allows him to now contest the applicability of

the kill zone theory of attempted murder at his 2014 trial. Respondent contends the issue is not properly before this court and that, in any event, substantial evidence supported the kill zone theory of liability. We address the issue on the merits and find no error. We agree with the parties that the abstract of judgment must be corrected. In all other respects, we affirm.

## STATEMENT OF THE CASE[1]

Bon was charged in counts 1–8 with attempted murder (Pen. Code, §§ 664/187)[2] and in counts 9 and 10 with discharging a firearm at an occupied vehicle (§ 246). It was further alleged that Bon committed all of the counts for the benefit of a criminal street gang (§ 186.22, subd. (b)(5)); that these offenses were committed while on bail or a grant of release on his own recognizance (§ 12022.1); that he personally discharged a firearm which proximately caused great bodily injury (§ 12022.53, subd. (d)); that he personally discharged a firearm (§ 12022.53, subd. (c)); and that he personally used a handgun (§§ 12022.5, subd. (a)(1), 12022.53, subd. (b)). A jury found Bon guilty of all counts as charged and all allegations were found true.

Bon was sentenced to an aggregate term of 320 years to life in state prison: 15 years each on counts 1–8, plus an additional 25 years on each count, pursuant to section 12022.53, subdivision (d). He was further sentenced to 20 years each on counts 1–8, pursuant to section 12022.53, subdivision (c), which was stayed pursuant to section 12022.53, subdivision (f). Sentencing on the section 12022.5, subdivision (a)(1) enhancements was imposed but stayed on counts 1–10.

Bon appealed, and on September 12, 2017, this Court issued its original opinion, which ordered clerical corrections to the abstract of judgment, striking the section

---

[1] On the court's own motion, pursuant to Evidence Code section 459, we take judicial notice of the record in appellant's previous appeal (*People v. Bon* (Aug. 16, 2018, F070490) [nonpub. opn.].)

[2] All further statutory references are to the Penal Code unless otherwise stated.

12022.5, subdivision (a) firearm enhancements as to counts 9 and 10.  In all other respects, the judgment was affirmed.

On December 13, 2017, the California Supreme Court denied Bon's petition for review, and the following day, this Court issued the remittitur.

On April 27, 2018, this Court granted Bon's motion to recall the remittitur and reinstated the appeal on the sole issue of whether it should remand the case to the trial court to determine whether one or more of the firearm enhancements should be stricken due to recent statutory amendments which conferred discretion on the trial court to do so. Respondent conceded that remand was appropriate.

In its August 16, 2018 opinion this Court remanded the case to the trial court for the sole purpose of holding a resentencing hearing to allow the trial court to exercise its discretion under the amendments to the firearm enhancements statute (§§ 12022.5, subd. (c), 12022.53, subd. (h)).  This Court affirmed the judgment in all other respects.

On November 14, 2018, the California Supreme Court denied Bon's petition for review, and the following day, this Court issued the remittitur.

On January 18, 2019, on remand, the trial court exercised its discretion and maintained the gun enhancements as previously ordered.  The trial court reiterated Bon's sentence as a total aggregate indeterminate term of 320 years to life in state prison as follows: 15 years to life on counts 1–8, plus an additional 25 years to life on each section 12022.53, subdivision (d) enhancement to run consecutively.

On January 24, 2019, Bon filed a notice of appeal.

**STATEMENT OF THE FACTS**

*Victim and Eyewitness Testimony*

On April 21, 2011, between 5:00 and 5:30 p.m., Police Officer Michael Kutz saw Bon, whom he knew from prior contacts, with two women in a faded black Nissan Altima, license plate No. 3EGE248, near 6th and E Streets in Madera.  Bon was not the driver.  Officer Kutz followed the Altima into an AM/PM parking lot, where one woman

3.

got out and entered the store, while the vehicle drove to the air pumps area. The store's video surveillance showed these movements occurring at 5:35 p.m.

Around 7:00 p.m. that same day, Alejandro Salas, his wife, Julieta Ochoa, and five children were stopped in their vehicle in the right lane at Riverside Drive and D Street in Madera. According to Salas, a faded black Nissan Altima was in the left lane, although Ochoa thought that they were at the intersection before the black car pulled up next to them. Both Salas and Ochoa saw one Hispanic woman driving, another Hispanic woman in the front passenger seat, and a light-skinned Hispanic man, in his late 20's or early 30's with "really short" hair and a mustache, in the back seat. Both Salas and Ochoa identified the man as Bon in a photo line-up four days after the incident, as well as at trial. Salas also identified Bon at the preliminary hearing.

The two vehicles were side by side for three seconds. Salas made eye contact with Bon, whom he described as "real fidgety," with his right hand tucked away on his left side. Ochoa, who also made eye contact, described Bon as leaning over and moving a lot. As Salas turned right onto D Street, the Altima cut in front of him and Salas followed the car down the street. Salas saw Bon going from side to side in the car, ducking his head down. Ochoa testified the car was driving "crazy," in and out, "very fast" and cutting off cars.

Near the intersection of Yosemite Avenue and E Street, Salas heard five or six shots. He did not see a gun but saw Bon's position and the muzzle flash. Ochoa heard shots, looked up, and saw the black car and a white SUV next to each other. In the white SUV, a Chevy Suburban, Mario Lopez, Sr. was driving his family to dinner. Lopez's wife, Elsa Hernandez, was in the front passenger seat. Alexis, Andrew, and Veronica were in the second row; Mario Jr., Manuel, and Lyana were in the third row. The Lopez family were Dallas Cowboy fans; their car had a Cowboys license plate frame and Lopez was wearing a blue Cowboys hat.

4.

Driving west on Yosemite Avenue near Gateway Drive, Lopez heard shots and Hernandez pulled him down. Hernandez recalled hearing something loud and telling everyone in the car to get down, but she did not see the shooting. Alexis, age 14, and Veronica, age 19, were hit by bullets.

Lopez drove to the hospital, where Officer George Yang spoke to the children. A bullet went through Alexis's bicep. She heard the gunshots but did not see the shooting. Veronica, who heard five to six gunshots, was hit by a bullet that went through the back of her neck. Lopez's left arm was hit by shattered glass, and there was a gunshot hole on his left sleeve.

Mario, age 11, and Manuel, age 10, told Officer Yang that a black four-door car pulled alongside them at Yosemite Avenue and Gateway Drive, when someone in the back seat brandished a handgun in his right hand, covered his face with his left hand, and fired four or five shots. Neither mentioned seeing any tattoos on the shooter's hands. None of the children in the Suburban could identify the shooter to Officer Yang, nor did they at trial, where they denied knowing anyone named Bon or anyone by the nickname "Cubs." In fact, most of the children who testified claimed not to remember the event at all and denied being shot at.

At the hospital after the shootings, Hernandez told Officer Eddie Guzman they were driving west on Yosemite Avenue and stopped for a red light at Gateway Drive when a black Nissan Altima drove up on the driver's side of their vehicle and stopped. A Hispanic man in the back seat of the vehicle stuck a handgun out of the rear passenger-side window and fired twice. Hernandez yelled for her family to get down and more shots followed before the Altima sped off.

Lopez told Officer Guzman he was driving west on Yosemite Avenue toward Gateway Drive and stopped at a red light behind other vehicles. A black Nissan Altima with two Hispanic women in the front seats pulled up next to him and stopped. A Hispanic man in the back seat pulled out a handgun, stuck it out of the rear passenger-

5.

side window, fired shots, after which Hernandez yelled, "Get down," more shots were fired, and the Altima sped off. Neither Lopez nor Hernandez said they recognized the shooter or could identify him, other than to say he was Hispanic.

*Law Enforcement Response and Investigation*

On April 26, 2011, five days after the incident, Detective Hector Garibay interviewed Lopez and Hernandez, a tape of which was played for the jury. Hernandez described the car she saw as dark, but she did not know if the shots came from the front or back seats. She claimed she saw "no face, no nothing." Lopez said he "didn't get to see nothing" because everything happened too fast. He only knew that, of the four shots he heard, the back window of his own vehicle was hit first.

Detective Garibay viewed the Altima, after it was impounded on another unrelated matter. He described that it was primered black or gray, and, when he saw it, recalled it was similar to the car in an earlier drive-by shooting in July of 2010 in which Bon was also involved. Detective Garibay found a red handkerchief on the passenger seat of the vehicle.

On the evening of May 3, 2011, Highway Patrol Officer Efren Jimenez drove past a dirt field, where he saw a faded gray Nissan Altima, license plate No. 3EGE248, with two Hispanic men standing outside the vehicle. Officer Jimenez made a U-turn, but the men were gone, although the vehicle remained. Officer Jimenez chased one of the men, whom he caught and identified in court as Bon. Bon did not obey commands, so Jimenez drew his gun. Bon gave Officer Jimenez a false name and birth date.

Bon was taken to the hospital where Officer Yang, dispatched there on another matter, recognized and arrested him. During booking, Bon said, "I want to tell you guys something. I'm psychic and you won't be going to court on this. People always want to point a finger because I got a familiar face, but when it comes down to it, charges will be dropped."

6.

When Detective Garibay told Lopez and Hernandez that Bon had been arrested, they appeared nervous and worried. Both claimed at first not to know Bon, but Lopez then said he did know Bon, that he was "like a brother" to him, and that there was no way Bon shot at him or his children. Lopez was adamant that he did not want to be "any part of this" and would not testify.

Evidence showed three bullets hit the white Suburban: one in the rear passenger window on the driver's side, one in the driver's side door, and one in the front windshield. One of those bullets went through the driver's headrest and two exited through the rear window on the passenger side.

On June 7, 2011, agents executing a search warrant at the apartment of Juan "Joker" Herrera and Jose "Eke" Guerrero and found a Jimenez Arms .9-millimeter semiautomatic gun behind a cushion of a living room chair. Three expended .9-millimeter Ruger shell casings were recovered near the Yosemite Avenue and Gateway Drive intersection. According to a Department of Justice firearms and tool mark examiner, two of the found shell casings had the same class characteristics but insufficient individual detail to determine they had been fired from the recovered firearm, although they could have been.

The firearms examiner concluded that the two bullet fragments that fell out of Alexis's clothing at the hospital had been shot from the recovered firearm, based on one bullet fragment's class characteristics and individual detail similar enough to be a match.

*Gang Expert Testimony*

Sergeant Jacob Tallmon testified as a gang expert about the Norteño or Northerners criminal street gang, which consists of many subset gangs who all identify with the color red, the number 4 or 14 and the letter "N." Tallmon explained that the rival gang of the Norteños is the Sureño gang, who identify with the color blue, the number 3 or 13, and the letter "M," and are derogatorily referred to as scraps or scrapa.

7.

According to Tallmon, the subset gangs in the Madera area were run by Herrera and Gustavo Moreno, with Guerrero as Herrera's right-hand man. Tallmon described the primary activities of the Norteño gang to include, among others, murder, attempted murder, robbery, assault with a deadly weapon, drive-by shootings and drug dealing, and he recounted four predicate offenses which occurred in 2009, 2010, and 2011. Tallmon opined that, at the time of the April 2011 shooting, Salazar was a Norteño, Herrera a leader of Norteño gangs, Gallegos a member of the Vario Tiny Winos, and Lopez an "active" Norteño.

Tallmon opined that shootings generally benefit the gang because the fear, reputation, and respect helped the gang's operations by preventing cooperation with law enforcement and interference with criminal activities. Tallmon opined that Bon's shooting at a car he believed to be occupied by rival gang members would benefit the gang because such a shooting showed dominance and intimidated opponents. Bon accidently shooting his own gang members would still benefit the gang, as it showed a willingness to kill and instilled additional fear into the community at large.

Tallmon testified Bon had gang tattoos identifying him as a Norteño, which showed a dedication to the gang. Tallmon opined that Bon, whose moniker was "Cubs," was, at the time of the shooting, an "active member of the local hood, VNSM [Vario North Side Madera], which is a subset and controlled gang within the Norteño family of gangs directly controlled by the Nuestra Raza and the Nuestra Familia at the state level." Tallmon's conclusion was based on Bon's jail letters and phone calls (which contained content and use of gang terminology), street contacts, incidents he was involved in, information from informants, deposits ending in 14 cents made by Bon to his girlfriend's trust account, his association with other gang members, his gang tattoos, and his programming in jail with other gang members.

*Testimony of Fellow Gang Members*

At the time of the shooting, active Norteño and paid informant, Eliseo Gallegos, was working with Sergeant Tallmon and other officers, informing on his fellow gang members. Gallegos first spoke to officers about this case when he was in jail for vehicle burglary, driving under the influence of drugs, and felony probation violations.

According to Gallegos, Bon, nicknamed "Cubs," and Lopez were both involved with the Norteño criminal street gang. The two men were "like brothers" and Lopez's entire family knew Bon. After the incident, when Lopez was at the hospital, Lopez called Gallegos to say he had been driving on Yosemite Avenue in his "white Tahoe," wearing his Cowboys jersey and hat, when somebody shot at him and that his children thought they saw Bon. Gallegos and some "friends" went to the hospital and spoke with Lopez. Lopez denied he called Gallegos or anyone else from the hospital.

A few days later, Gallegos and others spoke to Lopez again and talked to his children, who all told them the shooter was Bon. Gallegos and others went to the house where Bon was staying and confronted him. He appeared shocked and "was, like, 'Oh my gosh, what did I do?'" Gallegos took Bon to Lopez's house, where Bon told Lopez he thought they were-Southerners because there was a Vatos Locos Sureños (VLS) gang driving around Madera in a white Tahoe. Bon told Lopez he was sorry. Lopez appeared shocked and quiet. Bon did not say with whom he had done the shooting, but Gallegos and others found out it was "Selena" who drove a black car and that the gun was "shipped north," meaning it was given to a different gang.

Guerrero, who was affiliated with the Norteños was, at the time he testified, charged with active gang participation and possession of methamphetamine: Guerrero knew Bon and Gallegos, as well as David "Comcast" Salazar and Herrera (Herrera lived in his house) as Norteños. Guerrero was very close to Lopez and knew his children. Although Guerrero thought Lopez's children were associating with the Norteño gang, he did not think Lopez was.

9.

Salazar and Herrera were both granted immunity to testify but refused to do so.

*Wire Taps, Letters, and Jailhouse Phone Calls*

During 2011, the California Department of Justice targeted Nuestra Familia prison gang members and street-level Northerner associates in the Merced and Madera areas. Various Norteño gang members were wiretapped, including Juan "Joker" Herrera, who was in a leadership position with the Norteño gang.

Recorded as part of this ongoing investigation was a telephone call a day after the shooting in which Lopez spoke to Herrera, referring to the shooter only as "him" and saying he had first tried to deny it was him, although both Lopez and his son had seen the shooter's face. Lopez also said he had a new car, which the shooter did not know, "so instead of him confirming and like driving up he just ... assumed that somebody had a ride like mine that fucked with him a while back."[3] Lopez went on to say that he understood the shooter "putting in ... work" and that he was not mad at him, but that he should have confirmed the hit. Lopez forgave the shooter, but the matter was "in the big homies hands." Lopez said the shooter asked Lopez to kill him, which Lopez would have done had one of his children been killed. The shooter told Lopez he was going to give Lopez "the heat, the nine [he] shot" and pay Lopez for the windows that needed replacing.

On May 19, 2011, in another telephone conversation, Lopez and Herrera talked about re-routing the gun, which Lopez said he did not want and was "shooting" it to Herrera. That same day, Herrera told Guerrero that "Comcast" was supposed to get "that thing ... from the homeboy ... and give it to Mario," but that Mario (Lopez) was not keeping it but "shooting" it to the hood. Guerrero said he had already received it. However, when Guerrero testified, he denied ever possessing a gun related to this case

---

**3**     Lopez told Garibay he bought the Suburban four days before the shooting.

and thought he might have been referring, in the recorded conversation, to giving Lopez a ride.

Recorded jail telephone calls or visits between Bon and his girlfriend Maricela Guerrero were played for the jury. Maricela told him a gang member had asked for "that black thing," which Tallmon believed referred to a gun. Bon made remarks which Tallmon construed to mean that nothing was going to happen to him because he was of too much value to the gang. Bon suggested his trial strategy would be that he was a gang dropout. At one point, in one of the many recorded conversations, Bon rapped to Maricela, telling her she was in love with a "thug," that he was loyal to the gang lifestyle and that he had notoriety and respect.

Bon repeatedly asked Maricela to contact his "brother Mario" (Lopez) to get Lopez's address and give him a letter from "Preston" which he had mailed to Maricela. On June 12, 2011, Bon sent an envelope addressed to Maricela with a letter to Lopez from Preston "Sandman" Velines who, due to his rank, was in charge of the Northerners in the jail. The letter stated, inter alia, "We were sorry to hear of the tragic accident that took place," and indicated that those involved were remorseful, that unity in the gang was a priority and that Bon was depending on Lopez "to prove [Bon] was not the one." Bon indicated in several phone calls to Maricela that he was receiving a lot of respect in jail and that the "homies love me."

*Defense*

The defense questioned the integrity of the photo line-up procedure with Salas and Ochoa. An expert on cognitive psychology/perception and eyewitness identification testified that memory is not static and, if not committed to memory, is subject to rapid decay followed by gradual decay. According to the expert, certain characteristics, such as tattoos or scars, are "attention grabbers" or visual anomalies and, if not recalled, call the identification into question.

11.

## DISCUSSION

### I.       THE KILL ZONE THEORY

On appeal, Bon does not challenge the trial court's refusal to strike the firearm enhancements pursuant to the amendments to sections 12022.5, subdivision (c) and 12022.53, subdivision (h).  Instead, Bon attempts to re-open his appellate case to challenge the underlying attempted murders, questioning the application of the kill-zone theory as recently interpreted in *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*).

In his original appeal, Bon raised two issues related to the "kill zone theory" of attempted murder, both of which this Court rejected.  In our opinion, we noted that the California Supreme Court had granted review in a case involving the kill zone theory (*People v. Canizales* (2014) 229 Cal.App.4th 820, review granted Nov. 19, 2014, S221958).  The case remained pending before the California Supreme Court during the pendency of Bon's previous appeal and was decided on June 24, 2019.  Bon is now asking for "the application of this binding judicial precedent to his not-yet-final case."

Respondent contends Bon is foreclosed from making this argument due to the limited nature of the remand in this case.  As argued by respondent, Bon's convictions were affirmed on appeal and these cases were final in 2017 and 2018, upon completion of review of our appellate opinions upholding the convictions.

In support of its position that Bon may not re-address the issue of the kill zone theory, respondent relies on cases holding that, in an appeal following limited remand for sentencing issues, the defendant cannot challenge the conviction of guilt anew.  For instance, in *People v. Murphy* (2001) 88 Cal.App.4th 392, the defendant was convicted of petty theft with three prior convictions, each of which qualified as a strike for purposes of the three strikes law.  On appeal, we remanded the case to the trial court to decide whether to exercise its discretion to vacate one or more of the strike findings under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.  We affirmed the judgment in all other respects and did not reverse the sentence.  Upon remand, the trial court declined

12.

to vacate the strike findings and did not resentence the defendant. (*Murphy, supra,* at pp. 393–395.) In the ensuing appeal, the defendant asserted the trial court improperly used a prior conviction both to elevate his petty theft to a felony and to invoke the sentencing provision of the three strikes law. (*Id.* at p. 394.) We observed that "[i]n an appeal following a limited remand, the scope of the issues before the court is determined by the remand order." (*Id.* at pp. 396–397.) We concluded that since the trial court chose not to vacate a strike finding, it was not required to resentence the defendant, and so the matter of the defendant's sentence was not again before it. As a result, the defendant could not argue, on his second appeal, improper dual use of his prior convictions. The time for him to have raised that objection was on his first appeal. (*Id.* at p. 397.)

Other cases cited by respondent also held that a defendant cannot raise on appeal issues that were outside the scope of the remand. In *People v. Webb* (1986) 186 Cal.App.3d 401, the defendant was convicted of offenses committed in August 1982. He pled guilty to multiple charges and was sentenced to prison. On appeal, the judgment of conviction was affirmed but the matter was remanded for resentencing. Following his resentencing, the defendant again appealed, contending that, under section 1192.7 (which was added to the Pen. Code at the June 1982 Primary Elec.), the trial court had no jurisdiction to accept his plea bargain. (*Webb, supra,* at pp. 404, 409–410.) The Court of Appeal rejected the claim, observing that since it affirmed the judgment of conviction in the prior appeal and remanded only for resentencing, the defendant could not be permitted to make a direct attack upon his convictions in the second appeal. (*Id.* at p. 410.)

And in *People v. Smyers* (1969) 2 Cal.App.3d 666, the Court of Appeal found no errors in the conduct of the defendant's trial but reversed solely because the defendant was denied his right to counsel at the posttrial arraignment for judgment hearing. The reversal was specifically limited to the purpose only of rearraigning the defendant for judgment. In his subsequent appeal, the defendant attempted to raise what he considered

to be errors in the conduct of his trial.  Relying on the law of the case doctrine (rather than the jurisdiction conferred by the remittitur), the appellate court concluded the defendant was entitled to raise only errors connected with the hearing in which the defendant was rearraigned for judgment and sentence.  (*Id.* at p. 668.)

We note that the court in *People v. Senior* (1995) 33 Cal.App.4th 531, 538, reiterated that, "where a criminal defendant could have raised an issue in a prior appeal, the appellate court need not entertain the issue in a subsequent appeal absent a showing of justification for the delay."  However, the *Senior* court also stated, "We caution against an overly broad interpretation of our holding.  There are many circumstances—too numerous to contemplate—where legitimate appellate issues arise in the trial court following an appeal and remand.  Our decision should be narrowly applied only in cases where … (1) the issue was ripe for decision by the appellate court at the time of the previous appeal; (2) there has been no significant change in the underlying facts or applicable law; and (3) the defendant has offered no reasonable justification for the delay."  (*Ibid.*)

Here, Bon did not delay as he contested the giving of the "kill zone" instruction in his first appeal and we noted that the issue was, at that time, before the Supreme Court on review.  The subsequent *Canizales* decision presents a significant change in the applicable law.  We also note that the holding in *Canizales* has been recently found by one court to apply retroactively to all cases final on appeal.  (See e.g., *In re Rayford* (2020) 50 Cal.App.5th 754, 776–778.)  Assuming this issue is properly before us, we address Bon's claim that there is insufficient evidence to support a kill zone theory.  After further analysis, we disagree with his claim and affirm.

The underpinnings of the kill zone theory are that a defendant may be convicted of attempted murder of an individual who was not the defendant's primary target.  In *Canizales, supra,* 7 Cal.5th 591, our Supreme Court refined the circumstances for the appropriate use of a kill zone theory, holding that the kill zone theory may serve as the

14.

basis for an attempted murder conviction "when the jury finds that: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." (*Id*. at pp. 596–597.) "In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Id*. at p. 607.) "[T]he kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.' " (*Ibid*., citing *People v. Medina* (2019) 33 Cal.App.5th 146, 156.)

In *Canizales,* five shots were fired at a primary target and his companion from 100 feet away at a block party. The shots were "going everywhere" and killed an innocent bystander rather than the intended target. (*Canizales, supra*, 7 Cal.5th at p. 611.) The court concluded, "The evidence presented here showed that from a substantial distance [the defendant] shot five bullets in the direction of a target who immediately ran down a city street after the first shot was fired. This evidence was insufficient to support instruction on the kill zone theory." (*Ibid*.) Having determined the theory was not supported by the evidence, the *Canizales* court declined to address the defendant's

15.

constitutional challenge to the standard kill zone instruction found in CALCRIM No. 600. However, it observed, "the standard instruction should be revised to better describe the contours and limits of the kill zone theory as we have laid them out here." (*Id.* at p. 609.)

The present case is distinguishable from the facts of *Canizales*. Bon, a member of the Vario North Side Madera gang, a subset of the Norteño family of gangs, was in the back passenger seat of a car as it drove alongside the victims' vehicle, a Chevy Suburban. As Bon's vehicle pulled up next to the victims' vehicle, Bon began shooting directly at the Suburban. Bon fired approximately five to six shots at the Suburban, which contained eight passengers. Bon admitted to a fellow gang member that he shot at the individuals in the Suburban because he thought "they" were rival gang members, showing his intent to shoot at more than one person. The proximity of Bon to the victims when he shot multiple times at them from close range, as well as the confinement of the victims inside the Suburban, demonstrates a strong inference that Bon intended to create a zone of fatal harm and harbored the requisite intent to kill both the primary targets and everyone within the zone of fatal harm.

Bon's assertion that the method used—a handgun as opposed to an assault rifle, the limited number of shots fired that hit the Suburban, and specifically, as was argued at trial, not putting the front passenger and three of the children in the back row at risk— was insufficient to support the finding of specific intent, is unreasonable. The very fact that Bon created a hail of bullets at close range to a vehicle with eight occupants is the very definition of creating a kill zone. Under these circumstances, the jury could reasonably infer that Bon used a means that inevitably could result in the death of other victims within the zone of danger. (See., e.g., *People v. Stone* (2009) 46 Cal.4th 131, 138.)

The circumstances of the offense, the number of shots fired, the distance between Bon and the alleged victims, and the proximity of the alleged victims to the primary

targets support application of the "kill zone" theory, even after the Supreme Court's clarification in *Canizales.* We conclude the evidence is sufficient to support the finding of specific intent to kill under the "kill zone" theory.

## II.   ABSTRACT OF JUDGMENT

Bon asserts and respondent agrees that the abstract of judgment must be corrected to reflect that the section 12022.5, subdivision (a) enhancements as to counts 9 and 10 were stricken by the trial court.

In the prior opinion in this case, this court ordered that the section 12022.5, subdivision (a) enhancement be stricken as to counts 9 and 10, because the use of a firearm was an element of those counts, shooting at an occupied vehicle. However, a review of the post-remand abstract of judgment in this case reveals that the enhancements for counts 9 and 10 are marked with the letter "S", which stands for "stayed." As such, the abstract of judgment is in error and must be corrected to reflect that the section 12022.5, subdivision (a) enhancements as to counts 9 and 10 were stricken.

## DISPOSTION

We direct the superior court to correct the abstract of judgment to reflect that the section 12022.5, subdivision (a) enhancements attached to counts 9 and 10 are stricken and forward an amended abstract of judgment to the Department of Corrections and Rehabilitation. The judgment is affirmed in all other respects.

FRANSON, J.

WE CONCUR:


HILL, P.J.


DE SANTOS, J.

17.