Filed 8/16/21  P. v. Stelly CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br>  Plaintiff and Respondent,<br><br>v.<br><br>KAMANI STELLY,<br><br>  Defendant and Appellant. | A157142<br><br>(Contra Costa County<br>Super. Ct. No. 51711365) |

Following a jury trial, defendant Kamani Stelly was convicted of shooting into an occupied vehicle (Pen. Code, § 246[1]) (count one) and four counts of attempted willful, deliberate, and premeditated murders of Dexter Reed (Reed), Odall Qualls (Qualls), John Doe 1, and John Doe 2[2] (§§ 187, subd. (a), 664) (counts two through five), together with related true findings that defendant personally and intentionally discharged a firearm causing great bodily injury to Reed and Autumn White (§ 12022.53, subd. (d)).  Defendant was sentenced to an aggregate term of 37 years to life in prison.

---

[1]	All undesignated statutory references are to the Penal Code.
[2]	The trial court designated these victims as John Doe 1 and John Doe 2 as their identities were unknown.

1

On appeal, defendant challenges his convictions for the attempted murders of Reed, Qualls, and John Doe 2 on the basis that the trial court committed prejudicial error by instructing the jury on the kill zone theory of attempted murder. He further contends that his conviction for the attempted murder of John Doe 2 should be reversed because there was no substantial evidence to support either a kill zone theory or a specific intent theory. Defendant does not challenge his conviction for the attempted murder of John Doe 1.

We affirm the convictions for the attempted murders of Reed and Qualls (counts 2 and 3) as any instructional error was harmless beyond a reasonable doubt since a reasonable jury would have found defendant had the specific intent to kill Reed and Qualls. Therefore, the jury would have rendered the same verdicts absent the kill zone instruction. We reverse the conviction for the attempted murder of John Doe 2 (count 5) since, as conceded by the People, there was no substantial evidence to support the theories submitted to the jury – that defendant specifically intended to kill John Doe 2 or intended to kill everyone in a particular kill zone. We remand the matter for dismissal of count five and for resentencing. In all other respects, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

The charges arose from a shooting on Cavallo Road, a busy street in Antioch, on December 19, 2016. The prosecution's theory was that the shooting arose from a verbal argument defendant and his friend Cody Moss had with Reed, Qualls, and John Doe 1. While the loud argument was ongoing, and the two groups of men were some distance from each other, defendant took Moss's gun and fired 18 shots (emptying the gun) in the direction of the three men. Two bullets hit

2

Reed in his arm and stomach and seriously injured him. Two other bullets struck the windshield of a passing vehicle, seriously injuring passenger Autumn White. The surveillance videos of the incident revealed a fourth man, John Doe 2, but there was no evidence as to his identity or his location at the time defendant started to fire his gun.

At trial, defendant admitted he fired 18 bullets at Reed, Qualls, and John Doe 1. He claimed the shooting was justified because he and Moss were being pursued by the three men who were acting in a threatening manner. Specifically, the men were making multiple hand gestures, and defendant believed one man had a gun and was going to shoot him.

### A. People's Case

Reed testified he was smoking marijuana and "chilling" with two or three other men including Qualls outside an apartment building on Cavallo Road. Reed did not have a gun and did not see anyone in his group with a gun. As Reed sat on the front steps of the building, he became aware that Qualls and two or three other men had gotten into a verbal confrontation with the occupants of a car driving by the building. Because Reed was high on marijuana, alcohol, and possibly cocaine, he did not pay attention to the confrontation.

Shortly after the car went by the second time, Reed started walking north on Cavallo Road towards the intersection with East 18th Street. Qualls and two other men including John Doe 1 followed Reed as he walked north. Reed saw defendant and Moss walking south towards him. Defendant and Moss turned around and started walking north on Cavallo Road. Reed, Qualls, and John Doe 1 followed defendant and Moss across the intersection with East 18th Street and

3

continuing north on Cavallo Road. When the two groups of men were approximately 30 feet apart, Reed felt the situation become serious because his group was acting in an aggressive manner as they followed defendant and Moss.

While on the sidewalk near a pizza store on Cavallo Road (just north of the East 18th Street intersection), Reed was hit in the arm by a gun shot. Reed was then a few feet from Qualls and John Doe 1, but Reed did not know who fired the gun or the location of the shooter. Nor did Reed hear a gunshot before he was struck in the arm. He screamed, " 'I got hit,' " and tried to get away by fleeing south on Cavallo Road back towards East 18th Street. As he ran away, Reed was shot a second time in the stomach. He fell to the ground, rolled over, got up, and then continued running south across East 18th Street before falling in a parking lot.

The People presented the testimony of several witnesses who heard or saw the shooting. One witness identified defendant as the shooter, but none of witnesses saw the shooter's intended targets. The People also presented evidence of the recovery of a nine-millimeter Luger gun (found in a shed at the rear of the building where defendant lived) and 18 shell casings (fired from the recovered gun found in two clusters on Cavallo Road)[3], along with evidence that 18 bullets could be fired from the recovered gun without reloading it. A DNA test comparing buccal swabs from defendant and Moss with swabs from the

[3]    A majority of the 18 shell casings were found north of a telephone pole that was located on Cavallo Road, 427 feet north of the intersection of Cavallo Road and East 18th Street. It was 27 feet from the telephone pole further north to the beginning of a cluster of shell casings, and 53 feet from the telephone pole further north to another cluster of shell casings.

nine-millimeter gun magazine showed a mixed profile with defendant being a contributor to the partial major DNA profile found on the gun.

The jury saw surveillances videos and still photographs taken from several locations along Cavallo Road. One video showed defendant and Moss walking north on Cavallo passing the pizza store – the men appeared to be arguing with someone to their south outside the video frame. Another video showed defendant and Moss walking north on Cavallo Road opposite the pizza store – they paused while Moss withdrew a gun and handed it to defendant, defendant turned, lifted his arm, and began to shoot in a southernly direction.

B.     Defense Case

Qualls testified that he was standing outside of an apartment building on Cavallo Road with Reed and one other man whom he did not know (John Doe 1) (the Qualls group) when Moss drove his car past them two times. John Doe 1 yelled back, " 'You going to say that to my face?' " Moss then pointed out the window, yelled back something, and continued to drive his car. Qualls did not yell back, but immediately acted like he was going to reach for something to protect himself. He told the other men with him, " 'We don't got nothing, get in there. We don't know what they got.' " Moss then drove back a second time, yelled, and the two groups "had a verbal-type altercation." The passenger in Moss' car did not yell anything at the Qualls group. Moss then drove away and parked his car "about 400 feet" north on Cavallo Road.

Later that day, the Qualls group saw Moss and defendant walking down Cavallo Road toward the Qualls group. Moss had his hand in his pocket which meant to Qualls that Moss had a gun (Qualls

5

did not see a gun). The Qualls group was not looking to get into a confrontation with Moss and defendant but did walk north on Cavallo Road towards them because, if they were going to get shot, they did not want it to happen in front of the apartments. Qualls wanted to make it seem his group had weapons, so Qualls began yelling, trying to make a lot of noise, and had his hand in his pocket. Qualls did not think the situation was serious because, when the Qualls group started to walk towards Moss and defendant, Moss and defendant turned around and started to walk away. However, when the men were walking towards each other, Qualls felt threatened and that his life was in danger; if he had a gun he would have shot at Moss and defendant. Qualls did not see a gun in the hands of either Reed or John Doe 1.

The Qualls group continued to walk north on Cavallo Road, crossed East 18th street, and continued to the pizza store. Right before the shooting, the men were still yelling at each other. Qualls, Reed, and John Doe 1 were daring Moss to shoot them. Qualls did not believe Moss would actually shoot him because he did not think he had it in him. Qualls was distracted as a car drove by and the driver, a friend, yelled to ask if he was all right. Qualls said he was okay, and then heard what sounded like gunshots and saw John Doe 1 and Reed running in front of him. At the time the gunshots started, John Doe 1 was about "about two steps" in front of Reed, and Reed was "about three steps" in front of Qualls. Qualls did not see the shooter. After Qualls turned his back and ran away, the gunshots kept coming.

On direct examination, Qualls recalled that at an earlier court hearing he said that he did not believe the gunshots were meant for him, and that John Doe 1 had "escalated the issue." On cross-

6

examination, when asked why he did not think the shots were meant for him, Qualls said, "I don't know. Because, you know, I'm out there every day, so if a person wanted to do something to me, it would have happened." When asked who he thought the gunshots were meant for, Qualls said, "I don't know exactly. I don't know. I think they just having a bad day or something." Qualls confirmed that all of the men in his group were saying things but John Doe 1 was "doing the most to escalate the situation" by getting more upset and angrier, and getting pretty loud, so that Qualls even told him to " '[c]alm down]' " and " 'Dude, be quiet.' " While Qualls did not see the shooter at the time the shots were being fired, Qualls believed the shots were aimed more towards John Doe 1 because he was "in front" – according to Qualls, the three men were in a line, and Reed and John Doe 1 kept going, while Qualls stopped and turned around.

Defendant also testified. On the morning of the shooting, he and Moss left the residence where they lived together (an apartment in a building on Cavallo Road) to get marijuana. When they were heading back to their apartment, Moss was driving his car northbound on Cavallo Road. Defendant saw three men outside an apartment building on Cavallo Road – Reed and Qualls, whom defendant knew, and a third man (John Doe 1) whom defendant had seen before but he did not know. Defendant grew up in the same area as Reed and Qualls, knew them, did not have any previous problems with either of them, and considered Reed a friend. Defendant had never known Reed to have a gun but assumed Qualls was armed because the neighborhood had a lot of crime and drug activity.

As Moss "was speeding down the street, and he turned around and sped back down, turned around, sped back down," Reed and Qualls walked into the middle of the street, one unidentified man "got mad," and another unidentified man spoke but defendant could not hear him with the car windows rolled up. After Moss had driven by the three men a second time, Moss turned right onto East 18th Street, took a back route, and parked his car at his residence. Moss took his gun from the car console and put it in his pocket.

Defendant and Moss then started walking south on Cavallo Road toward the intersection at East 18th Street to go to a liquor store to buy rolling papers. At the intersection, Moss saw and started to yell profanities at Reed, Qualls, and John Doe 1, the three men yelled back, and they seemed "serious." Because the men were a "potential threat," defendant and Moss turned around and started walking back north on Cavallo Road toward their apartment with defendant ahead of Moss. Moss continued to argue with the three men who were following them. At one point defendant turned around and saw the three men walking together and continuing to follow, making "a lot of hand gestures and arguing back and forth, and they were still walking up on" defendant and Moss, which made defendant nervous that somebody was going to fight or that possibly shots would be fired. As the three man were "gaining" or "coming closer" to defendant and Moss, defendant was a little concerned that the three men had weapons.

As defendant approached his apartment, the three men got closer. Defendant testified the closest the three men got to him was "[a]bout 30 feet," but he did not remember when that occurred during the incident. As defendant and Moss continued to walk north,

8

defendant looked back and saw one of the three men (he did not know which one) reach for his hip area or jacket pocket and bring something out. Defendant thought the object was a gun and there was no doubt in his mind that his life was in danger. Within a "split second" of seeing the man grab for his hip, defendant told Moss to give him his gun, Moss gave his gun to defendant, and defendant just turned around and started shooting. Defendant did not recall pausing before taking the gun from Moss (as shown in a video).

Defendant did not remember how far away the three men were when he started shooting because the incident took place two years before the trial. While defendant heard the police officer's testimony that from corner where the pizza store was located (intersection of Cavallo Road and East 18th Street) to "the telephone pole in front of 1637 Cavallo" (where defendant took the gun from Moss, turned around, and started to fire the gun) was 427 feet, defendant believed that when he fired his shots the three men were not at the corner but were located further north of the pizza store and closer to him. Defendant did not know how many shots he fired but later learned he fired 18 shots.

Defendant was not trying to kill anyone – his "intentions [were] to back these people up off of me that could potentially take my life." When he started shooting, "they turned around and ran . . . [b]ack south." Although nobody shot back at him, defendant continued to fire his gun as he also continued walking south. He thought they were going to shoot at him, and that is why he shot at them. Because he felt his life was in danger, defendant fired his gun "so many times"; he was not thinking and it was just a reaction. Had his gun not run out of

9

bullets, defendant would have continued to fire even though the men had turned their backs and ran away. He did not feel he could stop and assess the situation and did not feel he had any other options. Although defendant did not know when Reed was shot, he believed Reed was partially facing him at the time Reed was shot in the stomach. After he emptied his gun, he tossed the gun away and ran to his apartment on Cavallo Road. Before and after he fired the shots, he was "in panic mode," his hands were shaking, his heart was pounding, and he was nervous and scared.

The police later arrested defendant as he left his apartment. At the police station, defendant learned his gunshots hit a passing vehicle going through the intersection of Cavallo Road and East 18th Street, but he did not intend to shoot at a car. Additionally, while defendant was shown surveillance videos of "four people running away," defendant did not recall seeing a fourth man (John Doe 2) either following him or at any point, and he did not know where that fourth man was located before the shooting.

On cross examination, defendant testified that he spoke to his mother after his arrest and told her that he was upset with Reed, Qualls, and John Doe 1 because they had been "[h]igh powering" – acting like they were better than defendant and Moss. Defendant explained that "[w]hen you're high-powering and walking up on people like you want to fight them, and you go for your hip area, yeah, you're liable to get shot."

C.    **Jury Instructions**

Before closing arguments, the court advised the jurors that a person "may intend to kill a specific victim or victims and at the same

10

time intend to kill everyone in a particular zone of harm or 'kill zone.' " The jury was instructed they could find defendant guilty of the attempted murders of Reeds, Qualls, or John Doe 2, if the other elements of attempted murder were satisfied and "defendant not only intended to kill John Doe 1 but also either intended to kill John Doe 2, Dexter Reed, and Odell Qualls, or intended to kill everyone within the kill zone."[4]

Defense counsel objected to the portion of the attempted murder instruction that discussed the kill zone theory on the basis that there was no substantial evidence to support a finding of guilt on a kill zone theory. The prosecutor argued the jury might find the kill zone theory applicable based on Qualls' testimony, which "endorsed the idea that John Doe 1 was the primary target."

D. **Prosecutor's Closing Argument**

---

[4]     Using the language in CALCRIM No. 600, the court advised the jury, in pertinent part: "The defendant is charged in Counts 2, 3, 4, and 5 with attempted murder. To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person. [¶] . . . [¶] A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of John Doe 2, Dexter Reed, and Odell Qualls, the People must prove that the defendant not only intended to kill John Doe 1 but also either intended to kill John Doe 2, Dexter Reed, and Odell Qualls, or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill John Doe 2, Dexter Reed, and Odell Qualls, or intended to kill John Doe 1 by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of John Doe 2, Dexter Reed, and Odell Qualls[.]"

11

In his initial closing argument, the prosecutor urged the jury to rely on the kill zone theory to convict defendant of the attempted murder of John Doe 2:

"So, let's talk about John Doe 2, the mystery man, right? Because this is the guy that nobody seems to know about. He's the fourth man running through the parking lot here. . . . [¶] So, the mystery man is John Doe Number 2. He's the listed victim in Count 5. And you might be saying, Well, how could he be a victim of attempted murder since no one even seems to know what he was doing there? And, I'll tell you how. It's called kill zone. This is a theory, a doctrine under the law, that says, that if a person is intending to kill a primary target, but they also decide, . . ., I'm just going to kill everyone around that target to ensure that I get my primary target, then that person has committed attempted murder against all the people in the kill zone. [¶] . . . [¶]

" . . . [T]he People's theory of the case, what the evidence shows you, is that John Doe 1 was the primary target. And who is John Doe 1? . . . [H]e's the guy that everybody knows, but nobody knows well enough to know his name, and he's the third man in the argument, the third man with Mr. Reed and Mr. Qualls. And he's the one's that getting the most animated. He's the one who is getting the angriest. He's the one who's yelling the most inflammatory things. And he's the one who's farthest in front.

"He's also the one who, apparently, according to everyone involved, is not a friend of the defendant. . . . Mr. Reed and Mr. Qualls were at one time friends or at least friendly acquaintances of the defendant. This mystery man, John Doe Number 1, who's doing all the yelling or the loudest yelling, apparently is not a friend of the

defendant.  So, he is the primary target here.  He's the one that the defendant originally wants to kill, but he's not limiting himself to that person. It's like the guy surrounded by the bodyguards.  If he has to shoot everybody, he has to kill everybody around him in order to get to John Doe 1, fuck it, why not? Right?

"Now, you can also conclude – that [defendant] just wanted to kill Dexter Reed and Odell Qualls for their own reasons.  I mean, Dexter Reed got hit twice, so it seems likely maybe he was actually getting specifically targeted too.  So, it may not be that he was just around this guy who was yelling.  The evidence would suggest that actually the defendant seemed to be paying some particular attention to Dexter Reed.

" And Odell Qualls . . . was yelling and gesturing too.  So you don't have to put it all on this one guy, this one John Doe. Seems there was evidence the defendant wanted to kill Dexter Reed, Odell Qualls, and John Doe 1 all for their own reasons.

"But John Doe 2 . . . is a gentleman who falls within the kill zone. It seems that he was uninvolved in this situation, and that the defendant decided, I'll just kill him because he's too close, he's with the rest of them, so I'll just kill everyone."

In the defense closing, defense counsel addressed the applicability of the kill zone theory for attempted murder:

"Now, I wanted to move on to the kill zone, and as [the prosecutor] said, this is a theory that has to do with there being a primary target and then other people nearby.  The prosecutor has decided that John Doe 1, the mystery man, has been the primary target.  I'm not sure how he comes to that conclusion.  It seems to be

13

based on the . . . statements . . . [he said in his closing argument]. [¶] [The prosecutor] said, John Doe 1 is not a friend of the defendant. . . . I don't know that that necessarily makes him an enemy or a primary target for attempted murder. He's somebody [defendant has] seen before. We never heard that he had any problems with him. There's no evidence of that. [¶] Then [the prosecutor] said, John Doe 1 is the person [defendant] originally intended to kill. Where's the evidence of that? We heard testimony from Odell Qualls. We heard testimony from Dexter Reed. We heard testimony from [defendant]. And not one of them said that [defendant] had an original intent to kill John Doe 1. [¶] . . . [¶] So, thus, [the prosecutor has] concluded that John Doe 1 is a primary target in this case. [¶] And then [the prosecutor] added, . . . that there was also evidence that [defendant] wanted to kill . . . Qualls and . . . Reed for his own reasons. Again, no evidence of that either. [¶] So, this kind of goes back to intent to kill as well. I don't think it's been proven to you based on this evidence here. [Defendant] was quite clear that he wasn't trying to . . . kill any of these people. He just wanted them to stop following him, to stop coming up on them. And so I would ask you to take that into account when looking at the kill zone instruction."

In rebuttal closing, the prosecutor again discussed the kill zone theory:

"Now, again, let's go back to Mr. Qualls. The defense attorney said that I just selected John Doe 1 as the primary target, and that I had no reason to do that. That's not true. Odell Qualls said that John Doe 1 is the primary target. He said he believed that because he was the farthest forward, and he was the loudest, and he was the one who

14

was sort of getting most upset. So, it makes sense from that standpoint. It all fits.

"Now, from my perspective, what I have been arguing all along, is that all of the men were targets, Reed and Qualls and John Doe 1, and only John Doe 2, he's the only one who sort of is going to get killed because he's by them and is in the kill zone, but everyone else is part of the argument. Everyone else had done something to participate in this confrontation and, therefore, to make [defendant] angry.

"So, it's not that I selected this. I'm - - in saying in the kill zone instruction that John Doe 1 was the primary target, that was what Mr. Quells believed. But I argued to you this morning, and I'll continue to argue to you, that the defendant was shooting at all of those people. Mr. Qualls was loud and in the argument. Dexter Reed was in the argument. Dexter Reed got shot twice. They were all targets."

The prosecutor concluded his remarks by arguing, "And what happened here is really, really clear. He got in an argument. He got tired of these guys yelling at him. He grabbed a gun, and he fired 18 shots. And he would have fired a hundred, and he intended to kill them all."

### E. Verdicts

The jury returned verdicts finding defendant guilty of shooting into an occupied vehicle (count 1) and attempted willful, deliberate and premeditated murders of Reed, Qualls, John Doe 1 and John Doe 2 (counts 2, 3, 4, 5), together with related true findings that defendant personally and intentionally discharged a firearm causing great bodily injury to Reed and White.

### DISCUSSION

15

I.     **Kill Zone Theory Instruction Harmless as to Attempted Murders of Reed and Qualls (Counts 2 and 3)**

After defendant was convicted, our Supreme Court clarified the appropriate jury instructions on the kill zone theory of attempted murder. (*People v. Canizales* (2019) 7 Cal.5th 591, 596 (*Canizales*).) Specifically, "a jury may convict a defendant under the kill zone theory only when the jury finds that: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm — that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death — around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Id.* at pp. 596-597.)

Defendant presents extensive argument, not specifically challenged by the People, explaining why the trial court erred in advising the jury on the kill zone theory for attempted murder in this case. However, even assuming merit to defendant's challenge to the kill zone theory jury instructions, we conclude any instructional error was harmless beyond a reasonable doubt as to the convictions for the attempted murders of Reed and Qualls.[5]

---

[5]     Because we agree with the parties that the conviction for the attempted murder of John Doe 2 should be dismissed for insufficient evidence, as discussed in Point II, *infra*, we do not address whether we should also reverse that conviction for instructional error in advising

16

If a trial court has erred in advising a jury on the kill zone theory of attempted murder, we review for prejudice under the standard enunciated in *Chapman v. California* (1967) 386 U.S. 18.  When applying this test, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[] the error was harmless beyond a reasonable doubt."  (*People v. Aledamat* (2019) 8 Cal.5th 1, 13.)  In other words, "we ask 'whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error.' " (*Canizales*, *supra*, 7 Cal.5th at p. 615.)

In support of his argument that the kill zone instructions were prejudicial, defendant asks us to consider portions of the prosecutor's closing argument, contending it was the "prosecutor's self-proclaimed 'theory of the case' [] that John Doe 1 was the intended target" and Reed and Qualls were in the kill zone.  However, the prosecutor made clear in rebuttal closing that it was the People's position that defendant specifically targeted Reed and Qualls, as well as John Doe 1, as those men had been involved in the verbal argument with Moss that precipitated the shooting, and the kill zone theory of attempted murder only applied to defendant's firing shots at John Doe 2.  Thus, we reject defendant's argument that the prosecutor's argument would have encouraged the jury to rely on the kill zone theory in convicting defendant of the attempted murders of Reed and Qualls.

Further, the record contains strong evidence that defendant intended to target Reed and Qualls.  Defendant specifically testified

the jury concerning the kill zone theory for the attempted murder of John Doe 2.

that he fired his gun because he felt threatened by Reed, Qualls, and John Doe 1, who had been verbally arguing with Moss, "making a lot of hand gestures and arguing back and forth," and they were "gaining on us . . . coming closer to us." As defendant explained, "[t]here is three individuals walking up on us, and you go for your hip area. Where I come from, you go for your hip area, you're grabbing a gun. So it's either me or you in this situation, and I rather it be you."

While defendant testified that he did not intend to kill the men but rather fired his gun hoping to scare them away, he readily conceded that once he fired the men immediately turned their backs and fled the scene without returning any gunshots. Nonetheless, he continued to fire a total of 18 shots, and managed to hit Reed twice. Although defendant said he considered Reed and Qualls to be "friends," he did not hesitate in firing 18 shots towards "the two men who were [his] friends," because "[t]hey posed a threat to [his] life, so why would [he] have any resentment [sic] of shooting them?" Given this evidence, it is clear beyond a reasonable doubt that a rational jury would have concluded defendant intended to target Reed and Qualls as well as John Doe 1 and would have rendered the same verdicts absent any instructions on the kill zone theory.

We reject defendant's argument that his intent to specifically target Reed and Qualls was called into question by his testimony that he fired in a panic hoping to scare the men away or Qualls' testimony that he did not know why someone would fire shots at him and he believed John Doe 1 was the intended target. Any question regarding intent raised by this testimony was resolved by defendant's admission that when he fired his gun his intended targets included Reed and

18

Qualls.  This testimony was in harmony with Qualls' admissions that he put his hand in his pocket to suggest he was armed and participated in the verbal altercation just before defendant fired his gun.  While shooting Reed twice is not dispositive of defendant's intent, such evidence coupled with defendant's testimony demonstrates beyond a reasonable doubt that Reed was an intended target of defendant's shooting spree.

In sum, even if the trial court erred in advising the jury on the kill zone theory of attempted murder, any error was harmless beyond a reasonable doubt as to the convictions for the attempted murders of Reed and Qualls.  Any reasonable jury would have found defendant intended to target both Reed and Qualls specifically, thereby rendering the same verdicts absent any kill zone instruction.  The cases cited by defendant are factually distinguishable and do not otherwise support a different result.

## II.    Reversal of Attempted Murder of John Doe 2 (Count 5)

The parties agree defendant's conviction for the attempted murder of John Doe 2 should be reversed for lack of sufficient evidence. We concur as the record demonstrates that neither defendant nor any of the trial witnesses knew the identity of John Doe 2 and there was no evidence as to John Doe 2's location at the time defendant started to fire his gun.

### DISPOSITION

The conviction for attempted murder of John Doe 2 (count 5) is reversed and the matter is remanded to the trial court with directions to dismiss count five and for resentencing.  (See *Sanders v. Superior Court* (1999) 76 Cal.App.4th 609, 616 [when a conviction is reversed

19

based on insufficient evidence retrial on the same charge is barred by the Double Jeopardy Clause, citing *Burks v. United States* (1978) 437 U.S. 1, 18].)

In all other respects, the judgment is affirmed.

               _____

               Petrou, J.

WE CONCUR:


_____

Fujisaki, Acting P.J.


_____

Chou, J.*


*People v. Stelly/A157142*

---

\* Judge of the Superior Court of San Mateo County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.