Filed 6/27/22 P. v. Vargas CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B309389 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA336486) |
| v. | |
| GEOVANNY ANTONIO VARGAS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Renee F. Korn, Judge. Reversed and remanded with directions.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Appellant Geovanny Antonio Vargas appeals from the superior court's denial of his petition under Penal Code section 1170.95 to vacate his first degree murder conviction.[1] The evidence at trial established appellant was present when his codefendant fatally shot a rival gang member in broad daylight, and after the two men fled together, appellant attempted to hide the gun. The prosecution alleged that before the shooting, appellant and his codefendant were informed rival gang members were crossing out their gang's graffiti, and appellant agreed to retaliate by committing either murder or assault. The jury was instructed that if appellant intended to aid and abet only an assault, he could be guilty of murder under a natural and probable consequences theory. The prosecutor relied on this theory (among others) during closing arguments, initially suggesting that the natural and probable consequences theory established appellant's guilt of first degree murder, before stating in rebuttal that appellant

_____

[1]     Undesignated statutory references are to the Penal Code.

could be guilty of first degree murder only under a premeditation theory. The instruction on the latter theory stated the defendant premeditated if he decided to kill before "committing the act that caused death" (as only the actual killer could have done). The jury convicted appellant and his codefendant of first degree murder. We affirmed the judgment, without addressing whether the jury might have relied on the natural and probable consequences theory. (*People v. Vargas* (Nov. 20, 2012, No. B234354) 2012 Cal.App.Unpub. LEXIS 8485 (*Vargas I*).)

After the enactment of Senate Bill No. 1437 (2017-2018 Reg. Sess.) (SB 1437), which eliminated murder liability under the natural and probable consequences theory, appellant filed a petition to vacate his conviction under section 1170.95. At his request, the superior court appointed counsel for him. The prosecution opposed the petition, and appellant's appointed counsel made no argument in reply. The court held a hearing, during which both parties' counsel argued the court should deny the petition without issuing an order to show cause. Appellant made a *Marsden* motion for substitution of counsel, which the court heard and denied.[2] The court proceeded to deny the petition, concluding appellant had failed to make a prima facie showing of eligibility for relief because the record of conviction established the jury rejected the natural and probable

---

[2]     *People v. Marsde*n (1970) 2 Cal.3d 118.

3

consequences theory in convicting him of first degree murder.

On appeal, appellant contends the court erred in denying his petition while, as a result of the court's denial of his *Marsden* motion, he lacked the assistance of counsel. He argues his appointed counsel was ineffective in failing to argue the jury might have convicted him under the natural and probable consequences theory. The Attorney General disagrees, arguing (1) the court properly denied the petition without issuing an order to show cause, because the jury instructions established the jury rejected the natural and probable consequences theory in convicting appellant of first degree murder; and (2) the court's denial of appellant's *Marsden* motion was proper and, in any event, harmless.

We conclude the court erred in denying appellant's petition without issuing an order to show cause. The jury instructions and closing arguments were ambiguous regarding whether appellant could be convicted of first degree murder under the natural and probable consequences theory. Because the record of conviction did not refute, as a matter of law, appellant's allegation that he was convicted under that theory, the court was required at the prima facie stage to accept his allegation as true. Accordingly, we reverse the order summarily denying the petition, and remand to the superior court with directions to issue an order to show cause and proceed in accordance with section 1170.95. We need not address the parties' dispute concerning appellant's *Marsden* motion.

4

# BACKGROUND

## A. Underlying Judgment

The People charged appellant and his codefendant, Lester Manuel Galdamez, with the murder of Gerardo Canenguez, with associated gang and firearm allegations.[3] (*Vargas I*, *supra*, 2012 Cal.App.Unpub. LEXIS 8485, at *1-*2.)

### 1. Trial Evidence

In 2008, appellant and codefendant Galdamez belonged to a gang called the St. Andrews Boys 13 (St. Andrews). (*Vargas I*, *supra*, 2012 Cal.App.Unpub. LEXIS 8485, at *2.) The murder victim, Canenguez, belonged to a rival gang called the Mara Salvatrucha 13 (M.S.). (*Id.* at *2.) Los Angeles Police Department Officer Lazaro Ortega, a gang expert, testified that in 2008, the St. Andrews and M.S. gangs were at war. (*Id.* at *2-*3, *13.) Officer Ortega further testified that the St. Andrews gang's primary activities included actual and attempted murder, as well as assaults with deadly weapons and with fists. (*Id.* at *2-*3, *13.)

An eyewitness to the shooting testified that on the morning of February 14, 2008, he saw Canenguez on a bicycle near the intersection of Clinton Street and Wilton Place in Los Angeles (in St. Andrews territory). (*Vargas I*,

---

[3] We grant the Attorney General's request for judicial notice of the record on direct appeal.

*supra*, 2012 Cal.App.Unpub. LEXIS 8485, at *3.) Shortly thereafter, the eyewitness heard a gunshot, and saw two men -- later identified as appellant and Galdamez -- standing across the intersection from Canenguez and a companion. (*Id.* at *3-*4.) Galdamez fired three shots at Canenguez, who fell off his bicycle. (*Id.* at *4.) As Galdamez and appellant retreated from the intersection, Galdamez exchanged gunfire with Canenguez's companion. (*Id.* at *4.) Another witness heard the gunshots, saw appellant and Galdamez flee, and followed the men to appellant's apartment building before calling 911. (*Id.* at *5.) Responding officers arrested appellant at his building. (*Id.* at *6.) During an authorized search of appellant's residence, the officers found a semiautomatic handgun, which was determined to have fired the bullet casings found at the scene of the shooting, and to bear DNA matching Galdamez.[4] (*Id.* at *6-*7.)

Canenguez was transported to a hospital, where he died from a gunshot wound to the head. (*Vargas I*, *supra*, 2012 Cal.App.Unpub. LEXIS 8485, at *5-*6.) On his person,

---

[4]    Galdamez hid before the police arrived -- first in a dumpster, then in the trunk of a car driven by Liliana Yoon, who was dating another St. Andrews member. (*Vargas I*, *supra*, 2012 Cal.App.Unpub. LEXIS 8485, at *2, *5, *8.) Yoon testified she overheard Galdamez tell her boyfriend he "caught" two M.S. members, and use the word "blast." (*Id.* at *5.) Galdamez was arrested in February 2009, after investigating officers interviewed Yoon. (*Id.* at *7.)

medical personnel found a pocketknife and a can of black spray paint. (*Id.* at *6.) Police officers noticed that near the scene of the shooting, St. Andrews graffiti had been freshly crossed out with black spray paint. (*Id.* at *6.) Officer Ortega, the gang expert, opined that if St. Andrews members learned their graffiti was being crossed out by a rival M.S. member, they were likely to confront the rival with "extreme violence," carrying an expectation that someone "could" die and a gun in their possession "m[ight]" have to be used. (*Id.* at *3, *18-*19.)

Upon appellant's arrest, he was taken to a police station and placed in a room with fellow St. Andrews member Javier Plascencia, who had been found near appellant's residence shortly after the shooting. (*Vargas I, supra*, 2012 Cal.App.Unpub. LEXIS 8485, at *6.) A video recording of appellant and Plascencia's conversation was played for the jury. (*Id.* at *6.) Appellant referred to a phone call from a neighbor (without disclosing the call's subject matter) and said, "We fucking seen 'em riding bikes . . . ." (*Id.* at *7.) He told Plascencia a man was shot in the head, and identified Galdamez as the shooter. (*Id.* at *7.)

Testifying in their defense, appellant and Galdamez claimed they were attacked by one or two gunmen while walking to Galdamez's friend's house, and Galdamez fired his gun in self-defense. (*Vargas I, supra*, 2012 Cal.App.Unpub. LEXIS 8485, at *8.) Appellant denied knowing Galdamez had a gun, or that a rival gang member was crossing out St. Andrews graffiti. (*Id.* at *8.) He

7

acknowledged that if St. Andrews members knew their graffiti was being crossed out by a rival M.S. member, they would probably try to kill "or hurt" the rival.

## 2. Instructions and Arguments

The trial court (Judge Anne H. Egerton) instructed the jury: "Unless I tell you otherwise, all instructions apply to each defendant." The court further instructed the jury (per CALCRIM No. 400): "A person is guilty of the crime whether he committed it personally or aided and abetted the perpetrator who committed it."[5] The court delivered instructions on two theories of aiding and abetting, viz., a direct aiding and abetting theory (CALCRIM No. 401) and a natural and probable consequences theory (CALCRIM No. 403). The natural and probable consequences instruction provided, in relevant part: "To prove that the defendant is guilty of murder, the People must prove that: [¶] 1. The defendant is guilty of assault with a firearm or simple assault; [¶] 2. During the commission of assault with a firearm or simple assault[,] a coparticipant in that assault with a firearm or simple assault committed the crime of murder; [¶] AND [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the assault with

---

[5]    During closing arguments, the prosecutor stated an aider and abettor is "equally" (or "just as") guilty as the perpetrator.

a firearm or simple assault." The instruction did not address the degree of murder.

The court further instructed the jury on express-malice and implied-malice murder (CALCRIM No. 520), and on premeditated first degree murder (CALCRIM No. 521). The premeditation instruction provided, in relevant part: "If you decide that the defendant has committed murder, you must decide whether it is murder of the first or second degree. [¶] The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before committing the act that caused death."

The prosecutor argued Galdamez was guilty of first degree murder because in shooting the victim, he acted on a premeditated and deliberate intent to kill. The prosecutor argued appellant was guilty of murder under any of three theories: (1) he acted with implied malice; (2) he directly aided and abetted the murder; or (3) he aided and abetted an assault, the natural and probable consequence of which was murder. Although the prosecutor indicated the implied-malice theory was limited to second degree murder, he did not initially suggest the natural and probable consequences theory was so limited. On the contrary, he suggested otherwise, arguing appellant was guilty of *first* degree

9

murder because he aided and abetted a confrontation while "knowing the consequences of confronting rival gang members" and "know[ing] that this could escalate into a shooting."

Appellant's counsel argued he was not guilty of any crime, because the prosecution had failed to prove he knew a rival gang member was crossing out St. Andrews graffiti, much less intended to retaliate.[6] In rebuttal, the prosecutor maintained appellant was guilty of murder because he agreed with Galdamez to confront the victim in retaliation for the victim's crossing out St. Andrews graffiti. For the first time, the prosecutor stated that the natural and probable consequences theory was limited to second degree murder, and that appellant was guilty of first degree murder only if the jury found he shared Galdamez's premeditated and deliberate intent to kill. The prosecutor did not address his earlier, inconsistent argument that appellant was guilty of first degree murder because he aided and abetted a confrontation he knew "could escalate" into a shooting.

### 3. *Judgment and Appeal*

The jury convicted appellant and Galdamez of first degree murder, and found the gang and firearm allegations true. (*Vargas I, supra,* 2012 Cal.App.Unpub. LEXIS 8485, at

---

[6]    Galdamez's counsel conceded Galdamez fatally shot the victim, but argued the killing was justified or excused under theories of self-defense and provocation.

*2.)  The verdicts did not specify the theory or theories on which the jury relied.  Each defendant was sentenced to a total term of 50 years to life.  (*Ibid*.)

Appellant appealed, challenging the judgment on various grounds immaterial to the instant appeal.  (*Vargas I*, *supra*, 2012 Cal.App.Unpub. LEXIS 8485, at *1.)  We rejected each challenge and affirmed, without addressing whether the jury might have relied on the natural and probable consequences theory.  (*Id*. at *9-*34.)

### *B. Section 1170.95 Petition*

In March 2019, appellant, acting pro se, filed a petition to vacate his murder conviction under section 1170.95, alleging he was convicted under the natural and probable consequences theory, but could not now be convicted of murder because of SB 1437's changes to the law.  At appellant's request, the superior court (Judge Renee F. Korn) appointed counsel to represent him.  In June 2020, following proceedings regarding the constitutionality of section 1170.95, the prosecution filed an opposition challenging appellant's eligibility for relief under the statute.  The prosecution argued appellant had failed to make a prima facie showing because in light of the jury instructions and the trial prosecutor's rebuttal argument, the jury necessarily rejected the natural and probable consequences theory in convicting appellant of first degree murder.

Appellant's counsel filed a reply brief, which made no argument in support of relief.  Appellant himself then

11

submitted a letter to the court, arguing he might have been convicted under the natural and probable consequences theory because (1) the instructions did not limit the theory to second degree murder, and (2) although the prosecutor stated in rebuttal that the theory was so limited, the jury might have disregarded this statement as inconsistent with its instructions.[7] Appellant also declared that at the time of the shooting, he did not know Galdamez had a gun, much less aid and abet Galdamez in shooting the victim.

In November 2020, the court held a hearing to determine whether appellant had made a prima facie showing. The court announced that although it believed the jury found appellant acted with intent to kill in convicting him of first degree murder, rendering him ineligible for relief, the court intended to issue an order to show cause, because the jury had been presented with the natural and probable consequences theory. Appellant's counsel argued the court should instead deny his client's petition, principally because, in counsel's view, the trial evidence failed to support the natural and probable consequences theory.[8] After hearing appellant's counsel's arguments, the

---

[7]     The trial court instructed the jury: "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

[8]     In our view of the trial record, it appears the jury reasonably could have concluded the evidence proved appellant intended to aid and abet an assault (the natural and probable
*(Fn. is continued on the next page.)*

court indicated it had reconsidered its intent to issue an order to show cause. The court then heard argument from the prosecutor, and stated that both attorneys' arguments supported the conclusion appellant had not made a prima facie showing. The court asked appellant whether he wanted to testify.

In response, appellant made a request for new counsel, which the court construed as a *Marsden* motion. The court held a *Marsden* hearing, during which it allowed appellant to explain why he was dissatisfied with his counsel, and to reply to his counsel's responses. Concluding that appellant's counsel had adequately represented him, the court denied his *Marsden* motion.

When the court reconvened the prima facie hearing, both parties submitted. At the conclusion of the hearing, and in a subsequent memorandum of decision, the court

consequence of which was murder), but failed to prove beyond a reasonable doubt he intended to kill. (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295-297 [jury reasonably could have convicted defendant of murder under natural and probable consequences theory, based on evidence he "at the least" intended to aid and abet assault with deadly weapon, where defendant and shooter saw victims fitting profile of rival gang members while driving by gas station, and urged driver to return to station so they could confront victims with firearms, in retaliation for killing of fellow gang member].) We need not decide the issue, as the Attorney General does not argue that the trial evidence failed to support the natural and probable consequences theory, or that such a failure of evidence would establish the jury rejected the theory.

denied appellant's petition without issuing an order to show cause, concluding he had failed to make a prima facie showing of eligibility for relief. The court reasoned: "After review of the court file, the jury verdicts, the jury instructions, the facts provided in the court of appeal decision, and the written and oral arguments, [the court concludes] Petitioner was a direct aider and abettor to the murder and as such, is ineligible under P.C. § 1170.95. . . . Petitioner's conviction of first degree premeditated murder indicates the jury's determination that Petitioner was a direct aider and abettor. Further, the jury's verdict illustrates the rejection [of the claim] that the murder was in self-defense. Quite simply, the facts do not support that Petitioner was convicted . . . under a natural and probable consequences theory." Appellant timely appealed.

## DISCUSSION

### A. Section 1170.95

SB 1437 eliminated murder liability under the natural and probable consequences doctrine. (See § 188, subd. (a)(3); Stats. 2018, ch. 1015, §§ 1, subd. (f), 2.) SB 1437 also enacted section 1170.95, which permits a defendant who was convicted of murder under the natural and probable consequences doctrine, but who could not be convicted of murder because of SB 1437's changes to the law, to petition the sentencing court to vacate the conviction and resentence the petitioner on any remaining counts. (§ 1170.95, subd. (a); Stats. 2018, ch. 1015, § 4.) After ascertaining that

14

a section 1170.95 petition contains certain required information, the court must appoint counsel for the petitioner (where requested), allow the parties to file briefs, and determine whether the petitioner has made a prima facie showing of entitlement to relief. (§ 1170.95, subd. (c); *People v. Lewis* (2021) 11 Cal.5th 952, 960-968 (*Lewis*).)

"[T]he 'prima facie bar was intentionally and correctly set very low.'" (*Lewis*, *supra*, 11 Cal.5th at 972.) "Like the analogous prima facie inquiry in habeas corpus proceedings, "'the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause.'"" (*Id.* at 971, quoting *People v. Drayton* (2020) 47 Cal.App.5th 965, 978 (*Drayton*).) "In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'" (*Lewis*, at 972, quoting *Drayton*, at 980.) This prohibition against factfinding is subject to a limited exception: "'if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner."'" (*Lewis*, at 971, quoting *Drayton,* at 979.) "However, this authority to make [factual] determinations without conducting an evidentiary hearing . . . is limited to readily ascertainable

facts from the record (such as the crime of conviction) . . . ." (*Drayton*, at 980.) "Only where the record of conviction contains facts *conclusively* refuting the allegations in the petition," thereby establishing the petitioner's ineligibility for resentencing "as a matter of law," may the court refrain from issuing an order to show cause. (*People v. Flores* (2022) 76 Cal.App.5th 974, 991-992.)

If the court finds the petitioner has made a prima facie showing, it must issue an order to show cause and hold an evidentiary hearing. (§ 1170.95, subds. (c)-(d).) "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by [SB 1437]." (*Id.*, § 1170.95, subd. (d)(3).) If the prosecution fails to meet this burden, the court must vacate the murder conviction and resentence the petitioner on any remaining counts. (*Ibid.*)

### B. Analysis

We conclude the superior court erred in denying appellant's petition under section 1170.95 without issuing an order to show cause. It was undisputed that appellant was not the actual killer. He alleged he was convicted under the natural and probable consequences theory, and he could not be convicted under any other, still-valid theory. If these allegations are true, appellant is entitled to resentencing. (See § 1170.95, subd. (a)(3).) The court was required to

accept appellant's allegations as true, and to issue an order to show cause, unless readily ascertainable facts from the record of conviction refuted his allegations as a matter of law.  (See *Lewis, supra,* 11 Cal.5th at 974; *Drayton, supra,* 47 Cal.App.5th at 980.)  As explained below, we conclude the record of conviction did not do so.

The jury instructions did not refute, as a matter of law, appellant's allegation he was convicted of first degree murder under the natural and probable consequences theory.  The instruction on the natural and probable consequences theory (CALCRIM No. 403) was given as a basis for finding appellant guilty of murder, but it did not address the degrees of murder.  Absent such delineation, the jury might have believed the degree of murder was necessarily equal to the degree of murder committed by the perpetrator, viz., Galdamez.  Indeed, the prosecutor stated that an aider and abettor was "equally" guilty as the perpetrator, and CALCRIM No. 400 suggested as much, by stating a principal was guilty of the crime whether he perpetrated it or aided and abetted the perpetrator who committed it.  Nothing in the instruction on premeditated first degree murder (CALCRIM No. 521) unambiguously directed the jury to determine appellant's personal mental state as an aider and abettor.  On the contrary, the instruction provided, "The *defendant acted with premeditation* if he decided to kill before *committing the act that caused death*."  (Italics added.)  Because Galdamez, not appellant, was undisputedly the defendant who committed

17

the act that caused death, the jury might have believed the instruction required it to determine only Galdamez's mental state. (See *In re Loza* (2018) 27 Cal.App.5th 797, 804 (*Loza*) [habeas petitioner might have been convicted of first degree murder under natural and probable consequences theory, because "when the court instructed the jury that it had to find that the 'defendant' premeditated and deliberated, the jury could have (and likely did) understand the word 'defendant' to mean . . . the [codefendant] shooter"].)[9]

We acknowledge that the instructions were arguably clarified by the prosecutor's statement, in rebuttal, that appellant was guilty of first degree murder only if the jury found he shared Galdamez's premeditated and deliberate intent to kill. In his initial summation, however, the

---

[9] We reject the Attorney General's attempt to distinguish *Loza* on the ground that there, certain language in the premeditation instruction directed the jury to determine the mental state of "the slayer." (*Loza, supra*, 27 Cal.App.5th at 804, italics omitted.) We discern no meaningful distinction between "the slayer" and "[t]he defendant . . . [who] committ[ed] the act that caused death." Further, we are unpersuaded by the Attorney General's observation that here, unlike in *Loza*, the jury was instructed that all instructions applied to each defendant unless otherwise provided. This instruction did not compel the jury to apply all references to "the defendant" to both defendants; on the contrary, the natural and probable consequences instruction logically could not have been applied to Galdamez, the actual killer, in stating the People were required to prove the elements of this aiding and abetting theory in order to prove "the defendant" guilty of murder.

18

prosecutor argued appellant was guilty of first degree murder merely because he aided and abetted a confrontation he knew "could escalate" into a shooting. Considered as a whole, the jury instructions and closing arguments were ambiguous regarding whether appellant could be convicted of first degree murder under the natural and probable consequences theory. Thus, in determining that the jury *necessarily* rejected the natural and probable consequences theory in convicting appellant of first degree murder, the superior court engaged in "'factfinding involving the weighing of evidence,'" which was impermissible in reviewing "any part of the record of conviction" at the prima facie stage. (*Lewis*, *supra*, 11 Cal.5th at 972, quoting *Drayton*, *supra*, 47 Cal.App.5th at 980.)

We are not persuaded by the Attorney General's reliance on *People v. Stevenson* (2018) 25 Cal.App.5th 974 (*Stevenson*), abrogated on another ground by *People v. Canizales* (2019) 7 Cal.5th 591. There, the Court of Appeal rejected the defendants' contention, on direct appeal, that they were convicted of first degree murder under a natural and probable consequences theory, reasoning that the sole instruction on first degree murder was a modified version of CALCRIM No. 521 (similar but not identical to the version of CALCRIM No. 521 delivered here), under which the jury was required to find premeditation and deliberation on the part of *each* defendant. (*Stevenson*, at 981-984.) Although the instruction stated "'[a] defendant'" acted with premeditation if he decided to kill before "'completing the acts that caused

19

death,'" the court did not expressly consider whether this language might have led the jury to determine only the mental state of the perpetrator. (*Id.* at 982, 984.) Assuming, arguendo, *Stevenson* was correctly decided, it is inapposite. Here, unlike in *Stevenson*, the prosecutor paraphrased CALCRIM No. 400 in a manner indicating that appellant's guilt as an aider and abettor was equal to Galdamez's as the perpetrator, and in his initial summation, the prosecutor suggested that appellant was guilty of first degree murder under the natural and probable consequences theory. Moreover, *Stevenson* did not concern a petition under section 1170.95, much less the statute's requirement to accept the petitioner's allegations as true at the prima facie stage. Thus, *Stevenson* does not persuade us that the record of conviction refuted appellant's allegations as a matter of law. (See *Drayton*, *supra*, 47 Cal.App.5th at 981 [trial court erred in denying petition at prima facie stage, where no facts in trial record refuted, "as a matter of law," petitioner's allegation he was convicted under felony murder theory]; cf. *Loza*, *supra*, 27 Cal.App.5th at 806 [even assuming it was "'highly unlikely'" habeas petitioner was convicted of first degree murder under natural and probable consequences theory, invalid instruction on that theory was not harmless beyond a reasonable doubt (italics omitted)].)

In sum, we conclude nothing in the record of conviction prevented appellant from clearing the "'very low'" bar set by the Legislature at the prima facie stage. (*Lewis*, *supra*, 11 Cal.5th at 972.) Accordingly, we reverse the order denying

appellant's petition at that stage, and remand to the superior court with directions to issue an order to show cause and proceed in accordance with section 1170.95.

## DISPOSITION

The order denying appellant's petition for resentencing under section 1170.95 is reversed. The matter is remanded to the superior court with directions to issue an order to show cause and proceed in accordance with section 1170.95.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

WILLHITE, J.

COLLINS, J.